Filed 1/12/15  In re Nicolas C. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re NICOLAS C. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KRISTIE M.,<br><br>    Defendant and Appellant. | G050390<br><br>(Super. Ct. Nos. DP024606, DP024607 & DP024608)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

\*        \*        \*

Kristie M. (mother) appeals from the dispositional judgment removing her children Nicolas C. (born October 1998), Madison M. (June 2002), and Arthur M. (June 2007) from her custody. (Welf. & Inst. Code, § 361, subd. (b); all further statutory citations are to this code.) She challenges the sufficiency of the evidence to support the juvenile court's finding there was or would be a substantial danger to the physical or emotional well-being of the children if they returned to mother's custody. Substantial evidence supports the judgment, so we must affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

In late January 2014, Orange County Social Services Agency (SSA) filed a noncustody petition seeking a determination the children came within the juvenile court's jurisdiction because they had suffered, or there was a substantial risk they would suffer, serious physical harm or illness, because of the parents' failure or inability to adequately supervise or protect them. (§ 300, subd. (b).) The precipitating incident occurred on January 13, 2014, when Madison refused to go home with mother after school because she feared mother's boyfriend, Jeff. SSA documented seven incidents where Jeff physically abused mother, dating from October 2012. The children had seen marks and bruises on mother, and some of the incidents resulted in Jeff's criminal prosecution and court orders restraining him from contacting mother. Jeff also had convictions for driving under the influence. In addition to the abuse against mother, Madison reported Jeff grabbed her arm "hard" the previous summer, and Arthur reported Jeff struck the top of his head with an open hand "really hard" after Arthur accidentally broke an ornament a few days before Christmas 2013.

Mother initially denied the children's allegations, stating she believed Madison and Arthur's father, Dennis, instigated the claims. Mother also denied Jeff resided in the home or that she allowed him to violate the restraining orders. But a social worker saw male belongings during a home visit and all the children except Nicolas

2

(whose father is deceased) reported contact with Jeff, as did a 16-year-old foreign exchange student living with the family, who declared she saw Jeff "all the time" and they had dined with him a few nights earlier.

After the social worker confronted mother with the children's statements concerning Jeff, mother refused to discuss the matter, stating she did not want to get Jeff or herself in trouble. Mother expressed concern Dennis would gain sole custody of the couple's children. At a team decision meeting (TDM), mother acknowledged allowing Jeff to violate the restraining orders.

SSA's petition noted mother recently obtained modification of the restraining order to allow peaceful contact with Jeff. Mother reported previously completing a personal empowerment program (PEP) and was currently participating in individual counseling. The social worker recommended mother retain custody of the children, but urged the court to prohibit mother from living with Jeff or allowing the children to have contact with him, and also to require mother to complete a domestic violence program.

At the detention hearing, the juvenile court learned Jeff had been terminated from a batterers program and a no-contact order from one of his criminal cases remained in effect. Nicolas testified Jeff had been spending nights at the residence until about a week earlier. Under these circumstances, the court followed the recommendation of the children's lawyer to remove the children from mother's custody. SSA placed Nicolas with a maternal aunt, and the younger children with Dennis. The court prohibited any contact between the children and Jeff.

In its jurisdiction and disposition report, SSA recommended reunification services for mother concerning Nicolas, and termination of child dependency proceedings concerning the younger children with exit orders. Mother continued to reside with Jeff, but contemplated moving in with the maternal grandparents to obtain custody of the children. She participated in weekly therapy sessions and welcomed a parenting class.

3

Nicolas desired to return to mother's home unless Jeff resided with her. Madison wanted to stay with Dennis and felt six hours of visits with mother was too many. Arthur asked to stay with his father, but enjoyed visits with mother.

During a supervised visit with Nicolas on March 16, 2014, Nicolas asked mother if she remained in a relationship with Jeff. She denied it, but refused to let Nicolas see her cell phone. She also tried to have an unsupervised conversation with Nicolas and then tried texting him, but he advised her they were not to discuss the case.

In April 2014, mother pleaded no contest to the amended allegations of the petition, but objected to the proposed disposition. The court scheduled a disposition hearing.

SSA amended its recommendation concerning Madison and Arthur to include family maintenance services for Dennis, with an enhancement plan for mother. The social worker increased mother's visits to eight hours a week, and reported mother's therapist did not feel mother had progressed enough to protect the children, but was moving in the right direction. Madison objected to increased visits with mother, explaining she did not trust mother, and believed mother had emotionally and physically abused her. Madison stated mother tried to talk to her about the case and pressured her to change her mind and agree to return to mother's care. Madison agreed to participate in joint therapy with mother. The social worker advised mother she would seek a modification to have Madison and mother see each other in a therapeutic setting. Mother agreed to the referral for conjoint counseling, but did not agree to less than eight hours of weekly visits with Madison.

Nicolas's caregivers reported they had seen mother in a car with Jeff. Mother responded "ok" when confronted with the fact she had been seen with Jeff, explaining he was "out of her life" but she needed a ride home and did not know who else to call. Mother had exceeded the social worker's requirements by completing three parenting programs.

4

At the disposition hearing in May 2014, the social worker testified mother had not sufficiently addressed the domestic violence issues. She cited mother's action allowing Jeff back into the home in violation of restraining orders despite her prior completion of a PEP. She noted mother had just started a new 10-week PEP program and the social worker wanted her to complete the program before recommending family maintenance services. The social worker also believed mother would benefit from specific domestic violence counseling because mother had not severed her ties to Jeff. Mother appeared in photographs with Jeff posted on mother's Facebook page when the social worker checked in March 2014, although the photos had been removed by the date of the disposition hearing. Mother's therapist told the social worker she did not feel mother was forthcoming about domestic violence issues. Mother's statement Jeff was the only person who she could ask for a ride in April 2014 showed she lacked a support system. The social worker expressed concern mother violated court orders by attempting to discuss the case with Nicolas and Madison, which suggested she would not cooperate with other court orders. The social worker also discovered prior requests by mother for restraining orders dating back to 2004, which showed a history of mother choosing violent partners.

Nicolas testified his mother did not talk about the case with him and he did not hear mother blame Madison. Mother did blame Dennis for instigating the case "because he doesn't want to pay child support." Nicolas stated Madison and mother interacted happily and lovingly during visits, but Madison, whose mood could swing rapidly, could also be "standoffish" with mother. Nicolas's preference was to live with mother, even if Jeff lived with them. But he did not like Jeff, who he described as a jerk and hypocrite, and did not want to live with him. Nicolas worried about mother's safety with Jeff, explaining he had seen mother with a black eye and holes in the wall. Nicolas suspected Jeff was picking mother up after visits because she would not let Nicolas accompany her to the pickup location or see her cell phone, and she refused to answer

5

direct questions about the issue. Nicolas also did not have a high opinion of Dennis, with whom he lived four or five years earlier. Nicolas described Dennis as a "drunk" who did not "know how to deal with kids correctly, yelled a lot." Dennis also used physical discipline, and once locked Nicolas, who was then "deathly afraid of the dark," in a closet, which Nicolas described as a "really messed up thing to do."

Mother acknowledged in her testimony she had placed her children at risk because she had been involved with two men who were violent toward her. She conceded her relationship with Jeff negatively affected the children. She admitted exercising poor judgment and regretted remaining with Jeff and obtaining modification of the restraining order. She claimed to have broken up with Jeff, asserting he moved out of her house around the beginning of March. She and Jeff communicated four or five times after he moved out, but she vowed never to see him again. She regretted asking Jeff to give her a ride after an April 2014 visit. She removed Facebook photos of Jeff in February and disputed the social worker's testimony on the dates. She changed her phone number a few weeks before the disposition hearing so Jeff could not call her and denied discussing the dependency case with the children. She described the programs she participated in and the insights she had gained. Her children were the most important thing to her and no man was "worth anything at all."

Madison testified mother and Jeff argued almost every day and she believed physical violence occurred because someone smashed a lamp and broke the television, and she saw mother with a black eye. Mother and Jeff provided contradictory explanations for the damage and injury. Jeff drank a lot of alcohol daily, often becoming angry, and on numerous occasions he drove mother and the children after drinking. She described an incident during the summer when Jeff grabbed her arm hard when she was in the swimming pool on her birthday. Madison feared for mother, her siblings and herself.

6

Madison disliked visiting with mother because mother and the maternal aunt, Nicolas's caretaker, gave her "dirty looks" and whispered to each other negative comments about her. Mother spoke to Madison twice about the case, asking why she did not want to live with her. Madison heard mother tell Nicolas "you need to say this" when called to "children's chambers" and believed mother urged Nicolas to say he wanted to live with mother.

Madison disliked joint therapy because mother would describe how much she missed her and Madison did not want to hurt mother's feelings by saying she did not want to live with her. Madison loved both her parents and brothers, but did not like Jeff because he "does drugs and he's an alcoholic and he's done bad things to my mom.". Madison felt safe and loved living with her father, who did not argue or fight with his current wife. She did not feel loved by mother, and did not feel safe living with her because she feared mother would let Jeff return. Mother told Madison that Jeff and she were no longer together, but Madison did not believe it.

Mother's current therapist and PEP instructor, Rose Robles, testified mother began weekly individual therapy with her on February 13, 2014 and began a PEP on April 22. Robles described mother as verbal, cooperative, and engaging. They discussed mother's goals, including decreasing her anxiety, and increasing her coping skills and knowledge of domestic violence and its effects on families and victims. Robles believed mother had made progress toward each of these goals, but could not offer an opinion whether mother would protect her children. Mother initially failed to disclose she continued to live with Jeff, and phoned Robles in distress on April 30 stating the social worker advised mother she had been seen in the car with Jeff and might not be getting the children back. Mother admitted she was wrong to contact Jeff for a ride and accepted responsibility for her children coming into the dependency system.

The juvenile court found clear and convincing evidence there was or would be a substantial danger to the physical or emotional well-being of the children if they

7

returned home, and no reasonable means existed to protect them without removal. The court stated it could not be assured mother would abide by a restraining or protective order "at this point. [¶] I'm not saying that's forever. I do think that mother is earnestly trying to learn how to be protective of both herself and her children, but she's not at that point. . . . [¶] And she's made a start on that with changing her cell phone, removing [Jeff] from her Facebook, having him move out of the home, but he also moved out of the home before and moved back in, so what I need to see is mother learn and apply the skills" needed to protect her children and herself.

The court approved SSA's case plan and directed SSA to refer mother to a new therapist and domestic violence program. It also directed mother and Dennis to participate in coparenting counseling. The court approved the proposed visitation plan, including monitored visitation with Madison at a neutral location, and granted SSA discretion to liberalize visitation in consultation with Madison's therapist. The court allowed the maternal aunt to continue to supervise mother's visits with Nicolas and Arthur.

II

DISCUSSION

*Substantial Evidence Supports the Juvenile Court's Finding There Was or Would be a*
*Substantial Danger to the Physical or Emotional Well-Being of the Children if They*
*Returned Home to Mother*

Mother contends the juvenile court erred in removing the children from her custody because there was "insufficient clear and convincing evidence of detriment." Specifically, mother complains the juvenile court granted Madison "the power to initiate dependency proceedings and dictate what would happen." Mother asserts that Madison is "running the case" and "does not want to improve her relationship with Mother and wants it strained forever." Mother notes, "Madison was not given a psychological evaluation and no expert testified as to her detriment if returned to Mother." Counsel

8

argues, "Mother may very well be right in thinking Madison is aligned with Father and it was his influence that caused Madison to react in the manner she did." Mother argues the juvenile court could have allowed custody to remain with mother with protective orders.

Section 361, subdivision (c), provides in relevant part: "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody."

We review the section 361 dispositional finding under the substantial evidence standard. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) We must affirm the juvenile court if "'there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact.'" (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1065 [substantial evidence "'must be reasonable in nature, credible, and of solid value'"].) The test is whether the trier of fact's ruling is reasonable in light of the whole record. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394.)

Here, mother pleaded no contest to allegations her children came within the jurisdiction of the juvenile court because the children had suffered, or there was a substantial risk they would suffer, serious physical harm because of mother's failure or inability to adequately supervise or protect them. The testimony at the disposition hearing demonstrated mother allowed herself to be drawn into a spiral of violence with serial abuser Jeff at the hub. Ample evidence supported SSA's and minor's counsel's expressed concern at the disposition hearing that mother would allow Jeff back into her life. Mother had acquiesced in Jeff's violation of the restraining orders, and allowed him

9

to live in the home with the children, which showed she had not benefitted from her ongoing therapy and completion of a PEP in November 2013. She continued to allow Jeff to remain in the home after the court removed the children in late January 2014. Mother did not remove photos of Jeff from her Facebook page until sometime after March 2014, and maintained contact with him as late as mid-April 2014, barely more than a month before the disposition hearing, and several months after claiming she had terminated their relationship. The social worker expressed concern with mother's lack of a support system other than Jeff.

Mother agreed in her testimony exposure to domestic violence posed a substantial danger to the children's physical or emotional well-being. The children saw marks and bruises on mother, and did not believe mother's explanation of her injuries. Mother discounted the children's claims of physical abuse and initially denied the children's allegations Jeff lived in the home, essentially accusing them of lying at Dennis's behest. Mother's failure to put her children's interests before her relationship with Jeff led to a loss of trust, especially for Madison. Madison understandably felt unloved and estranged from mother, who she felt blamed her for SSA's involvement with the family, and who Madison believed still desired Jeff in her life.

The social worker testified mother had not sufficiently addressed the domestic violence issues at the time of the disposition hearing. And as mother's therapist's testimony reflected, mother continued to suppress facts and minimize the domestic violence. Mother did not disclose to Robles she lived with Jeff until late February or early March 2014. She related only two of the seven or more domestic violence incidents, and minimized the abuse by describing it as "pushing." She did not disclose Jeff drove with the children while intoxicated. Mother's therapist could not offer an opinion whether mother would protect the children, and expressed concern mother would not cooperate with other court orders to protect the children.

10

The foregoing constitutes substantial evidence to support the juvenile court's detriment finding. The court did not err by rejecting the lesser alternative of maintaining mother's custody with protective orders because the record supports the court's finding it was too soon to determine whether mother would abide by such orders.

Mother's reliance on *In re Patrick S.* (2013) 218 Cal.App.4th 1254 (*Patrick S.*) is misplaced. In *Patrick S.*, the mother absconded with the couple's 11-month-old son, P.S., after divorcing the father. The father searched in vain for the mother and P.S. over the years. Mother and P.S. resurfaced when the boy was 13 years old, and the juvenile court took him into protective custody because of the mother's mental illness. Visits with the father went well, but P.S. expressed ambivalence about living with father. The social worker was concerned about placing P.S. with the father because the father had a pending military deployment and would be away from home for three months, deployment was stressful for families, the father's wife would have primary responsibility for the couple's children in addition to caring for P.S., who the social worker described as a bored, homesick adolescent who did not want to live with her. The social worker thought the father's plan to homeschool P.S. was misguided because P.S. had been isolated by a mentally ill mother and needed greater socialization, and P.S. was not interested in father's religion. The social worker feared a frustrated P.S. would run away and get lost or hurt.

The appellate court held the agency did not establish placement with the father was detrimental within the meaning of section 361.2: "The record leaves no doubt that Patrick is a competent, caring and stable parent. He was dedicated to serving his family, his community and his country. He had no criminal history, no referrals to child welfare services and no indication of substance abuse or mental illness. There are no other risk factors in his home. Patrick is very concerned about P.S.'s welfare. He paid child support every month for 11 years without knowing where his son was. He searched for him for years. When he learned of his son's whereabouts, Patrick immediately came

11

forward and requested placement, attended all significant hearings in the dependency proceedings, visited and contacted his son whenever possible, looked into obtaining recommended services for P.S. and his family through the Navy and his church, and participated in recommended services." (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1263.)

The court also noted P.S.'s anxiety and diagnosis of adjustment disorder did not support a detriment finding without a showing the father was unwilling or unable to obtain recommended therapeutic services for P.S. The court noted that although P.S. was 13 years old and was entitled to have his wishes considered, his preference was not the deciding factor in the placement decision. P.S.'s resigned acceptance to living with father did not signify he would suffer emotional harm. The court noted "in view of P.S.'s age and the likelihood he would only become more attached to his caregivers, friends and school as time progressed and commensurately more resistant to moving, the court erred when it focused on P.S.'s short-term emotional needs. Instead, the court should have placed greater weight on the long-term benefits P.S. would gain from becoming an integrated member of a family that included a father, stepmother, brother and sister." (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1265.)

Unlike the father in *Patrick S.*, mother was an offending parent responsible for the physical and psychological harm suffered by the children that necessitated the filing of SSA's petition. The juvenile court did not base its detriment finding on the children's anxiety or resistance to living with mother. Rather, the court's ruling stemmed from mother's failure to protect the children from exposure to violence in her home, and the court's belief mother had not, by the date of the disposition hearing, sufficiently addressed these issues. We discern no error.

## III

### DISPOSITION

The judgment is affirmed.


                                        ARONSON, J.

WE CONCUR:


O'LEARY, P.J.


THOMPSON, J.