Filed 11/30/15  In re Mason M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re MASON M. et al., Persons Coming Under the Juvenile Court Law. | D068009 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. JAMES M. et al., Defendants and Appellants. | (Super. Ct. No. J519103A-B) |

APPEALS from orders of the Superior Court of San Diego County, Sharon L. Kalemkiarian, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant James M.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant Deanna W.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego and Beth Ploesch for Mason M. and Ethan M., Minors.

Mason M. and Ethan M. were injured in a car accident after their mother, Deanna W.,[1] placed them in the car with her drunk brother behind the wheel. She appeals the jurisdiction and disposition orders, challenging the sufficiency of the evidence to support the court's jurisdictional findings she failed to protect them and they remained at substantial risk of harm. (Welf. & Inst. Code, § 300, subd. (b).)[2] James M., the noncustodial and presumed father of the boys, also appeals. He challenges the sufficiency of the evidence to support the court's denial of his request for custody on the ground of potential detriment. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

Deanna is a single mother to Mason, who was born in 2012, and Ethan, who was born in 2013. In August 2014, she and the boys came to California from their home in Virginia or Tennessee. She concedes that in November 2014 after her brother spent the night drinking, she and the boys got in the car with him for a road trip, with Mason unrestrained in the backseat. At a high rate of speed, the car rolled over and ended up 20

---

[1] Her appellate briefing spells her first name Deana, but she signed her name in court documents as Deanna.

[2] Further statutory references are to the Welfare and Institutions Code.

feet down an embankment. The car was reportedly stolen, he had no driver's license, and there was an arrest warrant out for him in Tennessee.

All occupants of the car were injured. Mason was bleeding from the ear, and he suffered ear fractures, two skull fractures, and a leg fracture. Ethan suffered bruising and lacerations of the upper body and face. The California Highway Patrol arrested Deanna at the scene for child endangerment and took her to jail. Both boys were taken to Rady Children's Hospital, and they were eventually placed together in a foster home.

The San Diego County Health and Human Services Agency (Agency) filed petitions on behalf of the boys under subdivision (b) of section 300, alleging Deanna was unwilling or unable to protect them from harm. Deanna reported to the social worker that Mason was autistic and Ethan " 'has some delays.' " She also reported she "has the comprehension of a 'first grader.' " She was in special education throughout her schooling "because of trouble with reading, comprehension and dyslexia." She has epilepsy and difficulty holding a job because of it. She suffers from manic depression and was placed in a mental hospital at age 16. She was not currently receiving any medical care or taking any medications. She admitted a history of marijuana use, but denied any current use. The social worker referred Deanna for several services.

Deanna identified James as the boys' biological father and, because she was unaware of his address, the Agency sent search requests to several states. In December 2014, the social worker received a call from James. He was living in Tennessee, and he requested custody of Mason and Ethan. He said he was Ethan's biological father, but when he met Deanna she was five months pregnant with Mason, and he did not know the

3

identity of Mason's biological father. James had not seen the boys for three to four months when Deanna "took off with them." He claimed she was an alcoholic, had the mentality of a teenager, and was charged in the past with child neglect. He would have to tell her when to change the boys' diapers, and she was more concerned with being on the computer and with her friends than with their welfare.

When the social worker confronted Deanna with James's denial he is Mason's biological father, she confirmed that was true. She clarified that James was the only father Mason had ever known. She identified Christopher S. as Mason's biological father, and the Agency undertook a search for him. When he was located, he said he did not know if he was Mason's father. He refused paternity testing because "I'm engaged and I have my own kids to worry about." He said he did not want notice in these proceedings.

The Agency's report for the jurisdiction and disposition hearing advised that Deanna and James had two child protective cases in Virginia. In 2012, there was a referral "with concerns of mental health issues for the mother including having homicidal and suicidal thoughts, diagnoses of [b]ipolar, ADHD [attention deficit hyperactivity disorder] and possibly mental retardation and learning disabilities." It was reported that Deanna was not taking her medications. James told the social worker in Virginia that "he has bipolar and has been off of his medication due to no health insurance." He "has mood swings but is able to manage his emotion[s]." During one unannounced visit, "Mason was in need of baby food, [and] there was dog feces and urine observed in an upstairs hallway . . . spread all over the floor."

4

In a 2014 referral in Virginia, there were "concerns of neglect to Ethan and Mason and marijuana use by the mother in the presence of the children." There were also "concerns with the condition of the home and the mental health status of the mother, where she was no[t] consistently receiving mental health services." Deanna told the social worker in *this* case that she did not recall any cases in Virginia, but it was possible there were some.

In February 2015, the court ordered an expedited Interstate Compact on the Placement of Children (ICPC) evaluation for James. The following month, the Tennessee ICPC manager notified the Agency that it "will not be approving [his] home at this time," because he "has not been able to verify stability in finances, housing, caregiv[er] resources or parenting abilities." Further, the Agency had asked James to complete parenting classes and enroll in mental health services, and "this has yet to be completed."

In an addendum report, the Agency recommended that the children not be placed with James "at this time." It stated he worked at a pizza restaurant between 35 to 40 hours per week, and sometimes he worked from 9:00 a.m. to 11:00 p.m., but he would adjust his schedule if the boys were placed with him. For child care, he intended to rely on his cousin's wife or his uncle's wife, but he admitted the cousin's wife had "problems with . . . [Child Welfare Services in Tennessee]." James did not participate in any mental health services or parenting education during the Virginia proceedings because he was too busy working. He had struggled with depression since the age of 15, and he was briefly hospitalized for depression a year ago, but he refused to take any medication. He

5

also reported "a significant medical history including having an enlarged heart and high blood pressure," and he was not regularly receiving medical care or taking medications because he lacked health insurance. The Agency recommended that he receive reunification services and "ongoing case management moving towards placement and reunification."

The Agency acknowledged that Deanna had engaged in some services and had visited the boys. The Agency believed it was premature to lift supervision because she had not demonstrated "insight into the original protective issue."

After several delays, in February 2015 the court considered the issue of jurisdiction. The court made true findings, sustained the petitions, and declared Mason and Ethan dependents of the court. The court continued the disposition hearing pending receipt of the formal ICPC evaluation from Tennessee.

A disposition hearing was finally held in April 2015. Deanna withdrew her request for a trial because the Agency now recommended that she have "short unsupervised [visits] under certain conditions," meaning 30 minutes of one of her two weekly 60-minute visits would be unsupervised at the social worker's office.

James appeared by phone. The Agency had received "a verbal update" from Tennessee "that the ICPC is denied," but despite continued requests it had not yet received a written evaluation. The extent of testimony elicited by his attorney was as follows. He lived in a two-bedroom mobile home. At an unspecified time during the previous two months, he had provided Tennessee with unspecified information pertaining to his employment. He was "in the process of starting" mental health services at a

counseling center in Tennessee.  He contacted the center and was told "to call back every two days to see when an appointment would open up so they could get me in for intake."  He had nonetheless not called the center for three days.

In addition to mental health care, James knew the Agency wanted him to take a parenting class.  He had not done so.  When asked why not, he responded, "I have been trying to contact the Agency about getting parenting classes and the parenting DC[S] [Department of Children Services] agency has refused to recommend those for me."  It was unclear whether the "agency" or "DCS" he referred to was in San Diego or Tennessee.  He did clarify that he left a voice mail for the social worker in San Diego approximately three weeks ago, but she did not reply.  His attorney did not question him about his plan for child care or providing for the boys' needs.  Deanna objected to placement of Mason or Ethan with James.

The court removed the boys from parental custody and continued them in foster care.  The court ordered supervised visitation for James.

## DISCUSSION[3]

### I

### *Deanna's Appeal*

Deanna challenges the sufficiency of the evidence to support the court's exercise of jurisdiction over Mason and Ethan.  "On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings.

---

[3]    Minors' counsel agrees with the Agency's positions and argues for affirmance of the orders.

7

[Citations.]  The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value."  (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.)

As the reviewing court, "[w]e have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence.  [Citation.]  Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact."  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

Deanna asserts juvenile court jurisdiction is improper because the Agency did not prove she *caused* the accident that injured Mason and Ethan.  However, under section 300, subdivision (b)(1) a child comes within the court's jurisdiction when he or she "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the *failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . .*"  (Italics added.)  Jurisdiction was not based on Deanna's direct misconduct, but on her failure to protect the boys from harm.

Deanna also asserts that "perhaps [she] should have refused to even allow her boys to ride in the car her brother crashed, much less allow one of them to ride ineffectively restrained."  That is an understatement.  It is well known that drinking and driving poses a " 'horrific risk.' "  (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1025 (*J.N.*).)

She claims, however, that "she could not have reasonably foreseen that her brother would crash the car and injure her boys." The claim is absurd. The evidence shows that before Deanna put the boys in the car with her brother, she knew he had been drinking heavily.

The Agency's detention report states: "[Deanna] reported that the maternal uncle and maternal grandmother were out at a bar until 3:30[ a.m.] and they left in the car to drive to Tennessee at 4:00[ a.m]. The mother reported questioning the maternal uncle several times about his alcohol use prior to getting into the car, but [ultimately] got into the car with the minors. The mother smelled alcohol and the grandmother was observed stumbling by the mother."

Another portion of the report states: "The mother stated that she was home with the children sleeping, the maternal grandmother and the maternal uncle went out to a bar in Ramona. The mother reported that at about 3:30 [a.m.] she was jolted awake by the maternal grandmother and the maternal uncle saying wake up, we're leaving, we have a car, we're going back to Tennessee. . . . The mother stated that the maternal grandmother was intoxicated and was falling over and was talking rapidly. The mother further stated that she asked the maternal uncle several times about his alcohol use and said 'you look like you've been drinking.' The mother stated that up until getting herself and the children in the car with him she felt 'skittish' on getting in the car out of concern that he had been drinking, but ultimately got in the car." Further, at the accident scene there were opened beer cans and a "12[-]pack case."

9

Additionally, Deanna's arrest report states: "[Deanna] was reluctant to get in the vehicle because [the brother] had been drinking. She ultimately decided to put both of her young children into the vehicle. [Ethan] was buckled into a car seat and [Mason] sat in the middle of the [backseat] unrestrained. . . . [¶] Deanna . . . placed her two children in imminent danger of being seriously injured or killed when she put them into the vehicle. She knew [the brother] had been drinking alcoholic beverages and she knew that he did not have a driver['s] license. Then she failed to properly restrain [Mason]. There was no car seat for [Mason] and no evidence that she buckled him up. [Mason] sustained critical injuries as a result of this collision. There were no seat[]belt cuts or abrasions anywhere on his body to indicate the use of a seat[]belt." Given her arrest for child endangerment, Deanna's assertion there was insufficient evidence of failure to protect is patently meritless.

We also reject the notion the evidence does not support a finding of risk of future harm. "[T]he purpose of section 300, subdivision (b) is to protect the child from a substantial risk of *future* serious physical harm and that risk is determined as of the time of the jurisdictional hearing." (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1397.)[4] In assuming jurisdiction, the court explained: "The court finds that this collision date is not unduly remote -- within the last several months -- and there's nothing in the evidentiary record before me that demonstrates that the issues that led to the lack of care

---

[4] The Agency asserts this issue pertains to the disposition orders, and Deanna has waived appellate review of those orders by withdrawing her request for a trial after the Agency agreed to give her limited unsupervised visitation. As we understand Deanna's briefing, the issue of future risk pertains to the court's jurisdiction order.

10

and supervision over the children have been eliminated by the mother.  In fact, the record tends [to] support a conclusion that she still needs to undertake substantial training and education and undertake the family . . .  [re]unification services that would allow her to prevent or eliminate the [risk of] any future harm."

The jurisdiction hearing was held three and a half months after the accident.  The Agency's jurisdiction and disposition report states Deanna "has not taken any responsibility for her actions or the serious harm caused to her children as a result of her choices and places the blame on her family members.  Furthermore, [she] has changed her story several times regarding the events that [led] up to the accident."  The report also states Deanna was "influenced by pressures from those around her" and has difficulty saying "no."  The report discusses several instances in which Deanna exercised poor judgment.  She reported that James sexually abused Mason, yet she allowed James unsupervised access to Mason.  She reported that Mason was ripped from her arms during a domestic violence incident with James, yet she did not contact the police and stayed in the home with James.  Further, she exposed both boys to their maternal grandmother, whom she described as abusive and an alcoholic, and to her brother, whom she admitted used marijuana daily and had a history of violence.  The Agency wanted Deanna "to be able to demonstrate her ability to provide for her children's basic needs including safe housing and to protect them from those who pose a risk to their safety and well[-]being."

An addendum report issued a few weeks before the hearing advised that Deanna had not seen a psychiatrist or begun counseling services.  She told the social worker she

11

had an appointment with a psychiatrist scheduled, but when the social worker later asked if she went, she "looked confused and asked 'did I have an appointment?' "  She missed the appointment and said "she would see someone 'soon.' "

An addendum report filed the day of the jurisdiction hearing states Deanna had attended *one* therapy session.  The therapist informed the social worker that Deanna "showed up several hours early to their scheduled appointment and when [the therapist] was going to an exercise class on her break, [Deanna] tried to go along with her."  Deanna scheduled a second appointment, but cancelled it.

Additionally, the detention report shows Deanna has a history of not observing child safety restraint laws.  The record shows that approximately two months before the accident at issue in this case, child welfare services in San Luis Obispo investigated a referral that Deanna and the boys were "riding in the back of a Budget moving van without car seats."  Deanna refused the offer of services and "lost contact with the assigned social worker."  We also note that Deanna denied recalling any child protective proceedings in Virginia.  We conclude the evidence amply supports the court's assumption of jurisdiction under subdivision (b) of section 300.[5]

---

[5]     Deanna's reliance on *J.N.* is misplaced.  While *J.N.* and the instant case both involve drunk driving, the issue in *J.N.* was whether jurisdiction was appropriate under section 300, subdivision (b) based on a single episode of endangering conduct when there was *not* substantial evidence of future risk.  (*J.N., supra,* 181 Cal.App.4th at pp. 1025-1026.)  *J.N.* explains that in addition to the egregiousness of the episode, the court "should also consider the present circumstances, which might include, among other things, evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs, or other steps taken, by the parent to address the problematic conduct in the interim . . . ."  (*Ibid.*)  That

12

II

*James's Appeal*

A

James challenges the sufficiency of the evidence to support the court's finding it would be detrimental to place Mason and Ethan in his custody. "After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing. [Citation.] At the dispositional hearing, the court must decide where the child will live while under the court's supervision." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.) "Section 361.2, subdivision (a) evinces the legislative preference for placement with the noncustodial parent when safe for the child." (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262 (*Patrick S.*).) The statute provides that if the noncustodial parent requests custody, "the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).)

"A court's ruling under section 361.2, subdivision (a) that a child should not be placed with a noncustodial, nonoffending parent requires a finding of detriment by clear and convincing evidence." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426 (*Luke M.*).) "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*Patrick S., supra,* 218 Cal.App.4th at p. 1262.)

is the type of information the court considered here. The evidence showed Deanna lacked insight regarding her past conduct and had not participated in services or taken any steps to ameliorate the risk of future harm to her sons.

On an appeal from a judgment required to be based upon clear and convincing evidence, " ' "the clear and convincing evidence test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]' [Citations.] 'We have no power to judge the effect or value of the evidence, to weigh the evidence [or] to consider the credibility of witnesses . . . .' " (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581, fn. omitted.)

In its ruling here, the court explained: "First, these are very young children. [S]o . . . they cannot speak out if something isn't going well. There will be no way for anyone to know. [¶] Secondly, when Mason was previously in your care, this was before Ethan was born, in 2012, . . . the Court is concerned about how you and [Deanna] did not properly care for him. And while this was something that was remedied once it was brought to the attention of the parents, that was a four-month[-]old baby in conditions in 2012 which were very serious. [¶] . . . [¶] Thirdly, I have to find that at this time, to the boys, you are a stranger. It has been a long time since they lived with you and even since they had substantial contact with you. They've been separated from you at least since June 2014 . . . ."

The court added that "while ICPC is not dispositive, . . . it does give the [c]ourt some further factual information as to the conditions that a similar agency in another state might find to give rise to a protective issue." Additionally, the court was concerned because James told the social worker that for child care he intended to rely on a person who had a child protective services history in Tennessee. The court believed James

14

"lack[ed a] real appreciation for what's involved with taking care of these two young boys."

We conclude substantial evidence supports the findings. The record shows that James has not addressed his mental health needs. Child protective services (CPS) in Virginia advised that Agency that in 2012 it received a referral with allegations of neglect and lack of supervision of Mason. CPS determined services were needed and opened a case. James reported he "ha[d] bipolar and ha[d] been off of his medication due to no health insurance." He did not comply with recommended mental health support services. The case closed in January 2013 when the family moved to Tennessee.

In 2014, CPS received a referral with reports of neglect of Ethan and inadequate supervision and hygiene for Ethan and Mason. Mason reportedly went without a bath for weeks, he had "diaper rash that [was] so bad it spread up his back and bled," and the "apartment [was] messy and the kids walk[ed] around with saggy dirty diapers." Further, there was reportedly "no interaction with Ethan, he [was] just left to cry and lay on a pillow all day." After an investigation a case was opened. The parents minimally cooperated with parenting services. The primary concern was the parents' untreated mental health problems, and they were uncooperative on that issue. They were approved for a "mental health support program," and they declined to participate. The case was closed in August 2014 when Deanna and the boys moved to California.

James admitted to the social worker here that he never participated in parenting education in Virginia "because he was too busy with his work schedule." He also admitted he had struggled with depression from the age of 15, and was briefly

15

hospitalized for depression after splitting up with Deanna, but he "has not been on any medication since then."

During the disposition hearing, James testified he was merely "in the process of starting" mental health assistance in Tennessee. He had not yet had one counseling session. He did not even have an appointment for a session. Rather, he had the name of a counseling center, and he had been trying to reach it by phone to schedule an appointment. In other words, James was in no better position than he was in the 2012 and 2014 Virginia cases with respect to addressing his mental health needs.

Further, the evidence shows James had limited or no contact with Mason and Ethan for a considerable period. The Agency's detention report states that according to Deanna, James stopped seeing the children long before she brought them to California. An Agency report prepared approximately one month before the jurisdiction hearing states James "has shown very little effort in having any contact with the minors or getting updates on their current welfare. [He] has not asked this worker how the minors are doing or asked if he could have contact with them or the caregiver. When this worker offered to provide [him] with the information for the caregiver so he could have contact with the minors, [he] stated he didn't have a way to write it down and would get it from me another time. The Agency has concerns that the father does not present as interested or concerned about the current status of his children, or any urgency in speaking with them or the current caregiver."

16

Additionally, an Agency report filed the day of the disposition hearing advises that James had called the boys' caretaker "one time a few Saturdays ago, and then has not called since." It is unclear whether he even spoke to either Mason or Ethan.

Moreover, James advised the social worker he intended to rely on a cousin's wife for day care when he was working, and he knew she had " 'problems' " with child welfare services in Tennessee. The only criteria he could specify for a care provider was that he or she " 'keep an eye on [the boys] and make sure they're fed.' "

"A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm." (*Luke M., supra,* 107 Cal.App.4th at p. 1425.) We conclude substantial evidence supports the court's detriment finding. James was involved in two previous cases in Virginia that were not resolved, but were closed when the parents moved; he had not begun to address his mental health needs; he professed that he wanted custody, but he showed no actual interest in the boys; and he had no plans to meet their needs, other than to entrust them to a relative with her own child protective services history.[6]

---

[6] James asserts that since he is a noncustodial parent the court erred by considering Tennessee's informal response to the ICPC evaluation. The issue is immaterial because other evidence is sufficient to support the disposition orders. In any event, although an ICPC evaluation is not statutorily mandated for a noncustodial parent, a court is, of course, not required to ignore an ICPC evaluation that has nonetheless been done. (*In re B.S.* (2012) 209 Cal.App.4th 246, 254; *In re C.B.* (2010) 188 Cal.App.4th 1024, 1032; *In re John M.* (2006) 141 Cal.App.4th 1564, 1573-1575.)

The Agency has moved to augment the record on appeal with a September 14, 2015, Agency report, which advises that a formal ICPC evaluation unfavorable to James had been received, and his last contact with the Agency was April 29, 2015, despite the Agency's numerous attempts to contact him, and he had not been in contact with Mason

DISPOSITION

The orders are affirmed.


NARES, Acting P. J.

WE CONCUR:


McDONALD, J.


PRAGER, J.*

---

or Ethan.  In *In re Salvador M.* (2005) 133 Cal.App.4th 1415, 1421-1422, this court held it was proper to augment the record to include a postjudgment report by the Agency that disclosed the grandmother's adoptive home study had been approved, evidence that mooted an issue on appeal.  Here, the Agency's postorder report is unnecessary to our decision, and thus we decline the motion.

\* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.