Filed 8/15/13

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re PATRICK S. III, a Person Coming Under the Juvenile Court Law. | |
| | D063016 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1082) |
| v. | |
| PATRICK S. II, | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed in part, reversed in part and remanded with directions.


Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Julie E. Braden, under appointment by the Court of Appeal, for Minor.

Patrick S. II appeals an order denying his request for placement of his son, Patrick S. III (P.S.), under Welfare and Institutions Code section 361.2, subdivision (a) (further statutory references are to the Welfare and Institutions Code), which requires the court to place a dependent child in the care of a noncustodial parent unless it finds that placement would be detrimental to the child's safety, protection or physical or emotional well-being. Father argues there is not substantial evidence to show that placement in his care would be detrimental to his son. We agree and reverse.

FACTUAL AND PROCEDURAL BACKGROUND

P.S. is the 14-year-old son of Patrick and D.S. When P.S. was 11 months old, D.S. left Patrick, taking P.S. with her. D.S. and P.S. moved from Hawaii to California to New Mexico to Texas and, in 2009, to San Diego. She did not maintain contact with Patrick or other family members.

Patrick searched for his son. He hired attorneys and a private investigator, contacted D.S.'s relatives, federal and state law enforcement and child welfare agencies and visited locations where he thought he might find his son. Patrick served in the United States Navy as a noncommissioned officer. He paid child support through the court and maintained medical and dental coverage for his son. In 2011, he redoubled his efforts to locate his son after learning that D.S. had filed a lawsuit in federal court in San Diego in 2009, later dismissed, alleging she and P.S. were homeless and law enforcement was not protecting them from physical and sexual abuse.

In May 2012, the San Diego County Health and Human Services Agency (Agency) detained P.S., who was then 13 years old, in protective custody after D.S. was

2

involuntarily hospitalized with paranoia and visual and auditory hallucinations. Her mental health condition was diagnosed as schizophrenia, disorganized type, chronic. D.S. became distressed when the social worker asked her about P.S.'s father. She said Patrick had sexually abused P.S. when he was four months old. D.S. knew this by the strange way the baby was crying. She did not make a report to child protective services but reported it to family court when she and Patrick divorced.

P.S. and his mother moved frequently. At times, they were homeless. P.S. attended 13 different schools. In May 2011, P.S. was diagnosed with disruptive behavior after yelling and running out of a classroom. When teachers followed him, he became combative and yelled, hit and kicked. According to the school nurse, P.S. had no friends and other students saw him as odd. He did well academically but lacked age-appropriate social skills. Currently, P.S. was enrolled in Home Independent Study. He spent a lot of time on the computer playing games and writing a book.

The Agency located Patrick, who lived with his wife and two young children in Washington State. Patrick said during their marriage, D.S. claimed she was afraid of him and accused him of sexually abusing their son. Patrick participated in services through the Navy Family Advocacy Program. The case was closed as unsubstantiated. As part of the divorce settlement from the State of Hawaii in 2000, he agreed to undergo a psychosexual evaluation before having unsupervised visitation with his son. Patrick never completed the evaluation.

Patrick flew to San Diego the day after he spoke to the social worker. He was happy and excited to see his son. Patrick asked to be considered for placement but was willing to proceed slowly to allow his son to adjust.

At the detention hearing, the court granted Patrick unsupervised visitation with P.S. and gave the Agency discretion to begin a 60-day trial visit with concurrence of minor's counsel. The court appointed a guardian ad litem and an attorney to represent D.S., who did not appear at any dependency hearings after June 2012. The Agency placed P.S. in a foster home.

The social worker said P.S. had a great week visiting Patrick and his family in San Diego. However, the social worker believed that Patrick and his wife, N.S., were overly optimistic about P.S.'s adjustment into their family. After the visit, Patrick telephoned P.S. every night. When the social worker asked P.S. where he wanted to live, P.S. responded, "I wish there was a place you could go and pick your parents, but no one does." He then sighed and said "go with dad . . . ."

Washington State social services did a courtesy check of Patrick's home. Patrick and N.S. did not have any criminal or child protective services history. Their home was clean, well-organized and safe. Patrick's commanding officer gave him a "glowing reference."

At the jurisdiction hearing on May 29, the court sustained the petition and ordered the Agency to submit an expedited Interstate Compact on the Placement of Children (ICPC) to Washington State to assess Patrick's home. (§ 300, subd. (b).)

P.S. wrote a letter to the court, stating he missed his mother and needed time to know his father. He did not want to be rushed into living with a stranger. He had no objections to visiting his father during the summer. P.S. liked his foster father. He wanted to stay in the foster home and see his mother.

P.S. visited his father and family from June 22 to July 11. He said he was bored and his younger siblings sometimes irritated him. He spent a lot of time on his computer. His father was busy working. They went swimming and to a barbecue.

After a court hearing on July 13, the social worker observed that Patrick and P.S. spent more than an hour and a half conversing freely and enjoying each other's company. P.S. told the social worker it really was not that bad at his father's home. He made some friends during the visit.

In August, Washington State denied the ICPC because Patrick (who was deployed at sea) had failed to fingerprint and did not keep an appointment with the social worker. In addition, Patrick would have to complete the Hawaii court-ordered psychosexual evaluation before the state would approve unsupervised contact.

At the end of September, P.S.'s court-appointed special advocate (CASA) said P.S. appeared to have resigned himself to living with his father. The CASA also reported that P.S. abruptly left places he described as noisy and chaotic.

The social worker met with P.S. on September 11. He told her he did not want to live with his father. He loved high school and was excited about his classes.

The contested disposition hearing was held on September 21, October 10 and 16, 2012. The court admitted the Agency's reports in evidence, as detailed above. The

5

Agency was concerned about placing P.S. with his father. Patrick had a pending deployment and would be away from home for three months. Deployment was stressful for families. Patrick's wife would have primary responsibility for two young children and would have to manage a bored, homesick adolescent who did not want to live with her. Patrick planned on homeschooling his son. P.S. had been isolated by a mentally ill mother and needed greater socialization. Patrick was Mormon. P.S. did not want to be involved in the Mormon religion. If P.S. moved to his father's house, he could get frustrated, run away and get lost or hurt. The social worker recommended the court condition any placement on an approved ICPC, P.S.'s participation in therapy and Patrick's completion of a parenting course on adolescent children.

Patrick moved for a directed verdict on the issue of detriment. The court rejected his argument that this court's opinion in *In re John M.* (2006) 141 Cal.App.4th 1564 (*John M.*) was controlling and denied the motion, finding that placement would be detrimental to P.S.'s emotional well-being. The court explicitly found that placement would not be detrimental to P.S.'s safety, protection or physical well-being. The court said P.S. had significant behavioral issues. His inability to deal with noise and chaos was not within the average range. P.S. did not want to live with his father. He wanted to attend high school. He did not practice the same religion as his father. P.S.'s opposition to placement would create conflict in the home. When P.S. was challenged by authority, his behavior became extreme. The court found that it would be detrimental to place P.S. in Patrick's care without a better plan for services for the family.

Patrick then testified on his own behalf, and called P.S.'s therapist, Celia Lopez, M.F.T., as a witness. The court accepted the stipulated testimony of the foster father and social worker.

Patrick testified he would be deployed two more times in the next 11 months. He would not go to sea after September 2013. During P.S.'s three-week visit, Patrick's work schedule was "pretty awful." It was his heaviest workload in an 18-month cycle. P.S. spent time on the computer, played with his younger siblings and went to the beach, park and library. He did chores and spent time alone drawing. He interacted with peers and made a friend at a church swimming party. P.S. spent a day on a submarine. It took a lot of work to get to know each other. P.S. was very well behaved. He complied with directions. Patrick and N.S. let P.S. know that their home was his home. Patrick was willing to participate in services and obtain services for P.S. There were many services available for P.S. through the military.

Patrick planned on homeschooling P.S. Homeschooling was misunderstood. It was not a home study program, like the one his son was doing when he was living with D.S. Homeschooling was specifically tailored to each child's needs and included a broad range of social activities. P.S. would be able to take two courses at a public high school, a university course and a karate class under the umbrella of home education. Consistent with P.S.'s interests, Patrick contacted an architect to arrange an internship for P.S. and a friend to tutor P.S. in Mandarin Chinese. While he was at sea, N.S. would oversee P.S.'s educational plan. She was a credentialed elementary school teacher. Patrick wanted his son to be happy, well educated and have practical skills.

7

When the hearing resumed on October 10, Patrick testified he was willing to enroll P.S. in a public school if it would reduce his son's stress levels. He contacted Fleet and Family Services to arrange individual and family therapy. Patrick was participating in a 10-week parenting class. Patrick was willing to facilitate P.S.'s contact and visitation with his mother, as permitted by the court. When asked to describe his son, Patrick said P.S. was bright, well behaved and scared.

Lopez provided therapy to P.S. She diagnosed P.S.'s mental health condition as adjustment disorder, unspecified. Therapy was designed to reduce P.S.'s pattern of avoidance and isolation, and improve his communication and social skills. P.S. was consistently anxious about the prospect of moving to his father's home. At times he appeared to be resigned to the move.

The court accepted the stipulated testimony of the foster father: P.S. lived with the foster father, his wife, grown daughter and her boyfriend, grandchild, and three other foster children. P.S. did not require any extra attention. The foster father was not concerned about him running away. When frustrated, P.S. went on walks and returned after 15 or 20 minutes.

The social worker stated in stipulated testimony: After receiving documentation concerning the 2011 school incident, the Agency referred P.S. to a clinical program for psychotic youths. P.S. did not qualify for the program.

The court found that the Agency met its burden to show by clear and convincing evidence that placement with Patrick would be detrimental to P.S.'s emotional well-being. P.S. was diagnosed with adjustment disorder, unspecified, and was in need of

8

continued therapeutic support. He had major anxiety about living with his father. Although Patrick had not caused any physical or psychological harm to his son, the court had to consider the lack of relationship between Patrick and P.S. and P.S.'s wishes. P.S. did not want to live with his father. Any appearance to the contrary was mere resignation and submission. Patrick did not understand P.S.'s needs. Patrick's attitude about homeschooling would create strife in the family. In addition, Patrick would be at sea for six of the next 11 months. P.S. had little to no relationship with his stepmother. The Agency could not adequately monitor the placement. The court wanted someone on the ground in Washington who would coordinate services and make unannounced visits to the home. Without an ICPC, Washington social services could not intervene in an emergency.

The court ordered reunification services for Patrick and D.S. It ordered P.S. to receive a developmental evaluation and a psychological evaluation if recommended by his therapist. The court said it was not ordering Patrick to undergo a psychosexual evaluation but it had no jurisdiction over Washington's ICPC requirements. The court set a six-month review hearing for April 11, 2013, and a 12-month review hearing for May 28, 2013.

DISCUSSION

A

Patrick contends there is not substantial evidence to sustain a finding of detriment by clear and convincing evidence under section 361.2, subdivision (a). He argues P.S.'s anxiety and resistance to living with him is not sufficient evidence that placement would

9

be detrimental to his emotional well-being, and argues the standard should be equivalent to section 300, subdivision (c), which permits the juvenile court to take jurisdiction when the child is suffering from severe emotional damage. Patrick states this court's decision in *John M.* is controlling and the court erroneously distinguished the cases on minor factual grounds. He maintains the court impermissibly conditioned placement on Washington State's approval of an ICPC. (Fam. Code, § 7900 et seq.)

The Agency argues there is substantial evidence in the record to support the finding, which was based on a number of permissible factors. The Agency maintains that P.S.'s emotional needs, his lack of relationship with his father, the father's lack of insight into P.S.'s needs for therapy, support and socialization and the Agency's inability to provide ongoing supervision constitute substantial evidence of detriment.

B

Section 361.2, subdivision (a) evinces the legislative preference for placement with the noncustodial parent when safe for the child. (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1132.) It states: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).)

The juvenile court must make the detriment finding by clear and convincing evidence. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426; *In re Isayah C.* (2004) 118 Cal.App.4th 684, 700.) We review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that placement would be detrimental to the child. Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt. (*In re Luke M.*, at p. 1426.)

C

The juvenile court found that placement with father would create a substantial risk of detriment to P.S.'s emotional well-being. The court based its finding of emotional detriment on the totality of circumstances, including P.S.'s wishes, anxiety about moving to his father's home, need for continued therapeutic services, the lack of an established relationship with his father and stepmother, father's scheduled deployments and his plan to homeschool P.S., and the lack of available child welfare services in father's home state. These factors do not constitute substantial evidence to support the finding that placement with Patrick would be detrimental to P.S.

This case is similar to *John M.*, in which this court concluded there was not substantial evidence to sustain a finding of detriment under section 361.2. In that case, the 13-year-old child had serious emotional problems. He had had limited contact with his father, who lived out of state, and did not want to live with him. The social worker conceded she had no information that the father would be unable to meet the child's needs. (*John M.*, *supra*, 141 Cal.App.4th at pp. 1570-1571.) This court further held that

11

an ICPC was not required for placement with an out-of-state parent and the juvenile court erred when it did not explore alternative means of providing services to the child. (*Id*. at pp. 1572-1573.)

Here, the court erred when it distinguished *John M.* on minor factual grounds. That case stands for the principle that where a child has a fit parent who is willing to assume custody, there is no need for state involvement unless placement with that parent would create a substantial risk of detriment to the child. (§ 361.2, subd. (a).) When the parent is competent, the standard of detriment is very high. (Cf. *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789 [in view of the constitutional interests at stake, the standard of detriment necessary to overcome presumption of placement with an offending parent at a review hearing is "fairly high"].)

The record leaves no doubt that Patrick is a competent, caring and stable parent. He was dedicated to serving his family, his community and his country. He had no criminal history, no referrals to child welfare services and no indication of substance abuse or mental illness. There were no other risk factors in his home. Patrick was very concerned about P.S.'s welfare. He paid child support every month for 11 years without knowing where his son was. He searched for him for years. When he learned of his son's whereabouts, Patrick immediately came forward and requested placement, attended all significant hearings in the dependency proceedings, visited and contacted his son whenever possible, looked into obtaining recommended services for P.S. and his family through the Navy and his church, and participated in recommended services.

P.S.'s anxiety and diagnosis of adjustment disorder, unspecified, does not support a detriment finding without a showing that his father would not be willing or able to obtain recommended therapeutic services for him. Unlike John M., P.S. does not have cognitive difficulties, a mental health diagnosis of serious emotional disturbance and attention deficit hyperactivity disorder, a history of oppositional and aggressive behavior from early childhood and hospitalization for uncontrollable aggression. (*John M.*, *supra*, 141 Cal.App.4th at pp. 1570-1571.) P.S. was described as polite, quiet, intelligent and well behaved. Patrick contacted Fleet and Family Services to arrange therapeutic services for P.S. and informed the court that a wide variety of social services from different sources were readily available to the family. Similar to this court's finding in *John M.*, there is not substantial evidence to show that Patrick could not meet P.S.'s therapeutic needs. (*Id.* at p. 1571.)

We are also concerned about the court's reliance on Patrick's scheduled deployments with the Navy as a factor in determining detriment. (Cf. Fam. Code, § 3047, subd. (a) [party's absence is not, by itself, sufficient to justify a modification of a custody or visitation order if the reason for the absence is the party's activation to military duty, mobilization or deployment out of state].) In addition, the juvenile dependency system has no jurisdiction to intervene when an incarcerated parent delegates the care of his or her child to a suitable caregiver. (*In re Isayah C.*, *supra*, 118 Cal.App.4th at p. 700; *In re V.F.* (2007) 157 Cal.App.4th 962, 966.) This principle applies when the parent is unavailable because of his or her service in the military. Here, the court found that P.S.'s stepmother was a loving and dedicated mother to her two children. There is

13

nothing in her history or current circumstances that would render her unfit to parent P.S. on her own for a relatively short period of time. To the extent N.S. would require support services during Patrick's absence, the record shows that such services were available to her through Fleet and Family Services. She also had community support.

Compliance with the ICPC is not required for placement with an out-of-state parent. (*John M*., *supra*, 141 Cal.App.4th at p. 1575.) The court is required to consider alternative means of providing services when the child is placed with an out-of-state parent. (*Id*. at p. 1572.) In view of Patrick's exemplary service in the Navy, his long history of compliance with child support orders, P.S.'s age and abilities, and the lack of any risk to his physical health or safety, the court could have, but did not, consider whether ordering Patrick to comply with services, regularly communicate with the Agency and make P.S. available to the social worker was a reasonable alternative to ICPC monitoring.

With respect to the court's concerns about Patrick's plan to homeschool P.S., the court did not consider its inherent powers to direct all such orders to the parent of a dependent child as the court deems necessary and proper for the child's best interests. (§ 245.5.) Although a parent possesses a constitutional liberty interest in directing the education of their children, that right yields to state interests in certain circumstances. (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1101.) "As against the state, this parental duty and right is subject to limitation only 'if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.' [Citation.]" (*In re Roger S*. (1977) 19 Cal.3d 921, 928.) To

14

the extent the court found that homeschooling would jeopardize P.S.'s health and safety and disbelieved Patrick's testimony he was willing to be flexible about his son's educational plan, the court could have set parameters for P.S.'s education and ordered Patrick to design and implement an educational plan consistent with those parameters. (*Jonathan L.*, at p. 1101.)

At the time of the dispositional hearing, P.S. was 13 years old. He was entitled to have his wishes considered. However, a child's preference is not the deciding factor in a placement decision, even when that child is a teenager. (*In re Luke M., supra,* 107 Cal.App.4th at p. 1426; *John M.*, *supra*, 141 Cal.App.4th at p. 1573.) The liberty interest of a minor is not coextensive with that of an adult. (*In re Roger S.*, *supra*, 19 Cal.3d at p. 928.) The court found that although P.S. did not want to live with his father, he was resigned to doing so. Resignation does not constitute substantial evidence of emotional detriment. (In a teenager, resignation and submission is often as good as it gets.) We understand that P.S. quickly became attached to the first stable parental figure in the first stable home he ever had. Nevertheless, foster care is not a preferred placement.

Preservation of the family is the preferred permanency plan. (§ 300.2.) The court informed the parties that it anticipated placing P.S. with his father in the future. Under these circumstances, particularly in view of P.S.'s age and the likelihood he would only become more attached to his caregivers, friends and school as time progressed and commensurately more resistant to moving, the court erred when it focused on P.S.'s short-term emotional needs. Instead, the court should have placed greater weight on the long-term benefits P.S. would gain from becoming an integrated member of a family that

15

included a father, stepmother, brother and sister. The record clearly shows that P.S. has a competent, caring parent who desires to assume custody of him.

We conclude that the Agency did not meet its burden of proving detriment by clear and convincing evidence, and the juvenile court erred by finding that P.S.'s placement with Patrick would be detrimental within the meaning of section 361.2, subdivision (a).

## DISPOSITION

The detriment finding is reversed. The matter is remanded to the juvenile court with directions to hold a new dispositional hearing on the issue of placement under section 361.2, subdivision (a). Nothing in this opinion should be construed to prevent the court from considering new evidence or changed circumstances arising during the pendency of this appeal. In all other respects, the dispositional findings and orders are affirmed.

McINTYRE, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

16