Filed 9/6/24  In re I.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re I.S. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>A.M.,<br><br>    Defendant and Appellant. | F087022<br><br>(Super. Ct. Nos. JD143270-00, JD143271-00, JD143272-00)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from orders of the Superior Court of Kern County.  Susan M. Gill, Judge.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Carissa A. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Detjen, Acting P. J., Franson, J. and Snauffer, J.

A.M. (father) appeals from the juvenile court's October 9, 2023 orders continuing the placement of his three children, I.S., J.M., and F.S. (collectively, the children), from an 18-month review hearing. Father and the child welfare agency were requesting that the children be placed in his care based upon a lack of detriment. However, the court found that it would be detrimental to return the children to father's care.

On appeal, father contends that the juvenile court's finding that it would be detrimental to return the children to his custody was not supported by substantial evidence. He argues that the court's orders should be reversed and remanded with directions to enter new orders placing the children in his custody. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Initial Removal

In April 2022, the children were taken into protective custody by law enforcement after their mother, M.G. (mother), was reported missing and father's whereabouts were unknown. A social worker from the Kern County Department of Human Services (department) was assigned to investigate the referral from law enforcement. The social worker made in-person contact with the children in placement.

I.S., at 15 years of age, reported that mother went missing the previous morning. At approximately 4:00 p.m. on the previous afternoon, mother sent a message to 14-year-old J.M., which advised the children to contact their stepfather, C.T. (stepfather), if they needed anything. Mother explained that she was not doing well, and she asked J.M. to care for his siblings as "the man of the house." Stepfather came over to their home, and he told the children that mother had cancer and left to hide it from them.

Mother and stepfather were in a dating relationship for five years, and the children, mother, and stepfather lived together during that time. However, mother and stepfather separated around one to two years ago. I.S. explained that the children had no contact with father. Mother and father separated when she was approximately six years old, and she had not seen father since that time. It was her understanding that mother and

2.

father separated because father was abusive, and he reportedly used and sold drugs. I.S. and J.M. both witnessed domestic violence when mother and father lived together. None of the children had any contact information for father. F.S., at 13 years of age, was short with answers because he had been sleeping.

The children identified their maternal aunt as a potential option for placement. The social worker interviewed the maternal aunt by phone. The maternal aunt was shocked to hear about mother's cancer. She did not have any contact information for father or know his whereabouts, but she did provide stepfather's phone number. The social worker advised the maternal aunt to provide information to apply for emergency placement of the children.

Next, the social worker spoke to stepfather over the phone. Stepfather was aware of mother's cancer, but he did not know her whereabouts. Mother and stepfather began their relationship in March 2013, and they were married in November 2017. There was a separation in May 2019, but they were still legally married. Their separation was reported to be on good terms, and he was currently living in San Fernando.

Stepfather kept in contact with the children and travelled to visit the family when he was able. Stepfather, mother, and the children all went to a theme park two weeks earlier to celebrate birthdays. He expressed his interest in taking placement of the children. The social worker provided him with a phone number to speak with the children in their current placement.

The children informed the social worker that they felt safe when they lived with stepfather. The social worker asked the children whether they would choose to live with the maternal aunt or stepfather. They responded that it would be a difficult decision, but they chose their aunt as a first pick. J.M. indicated that stepfather believed it would be easier for them to live with the maternal aunt, and stepfather would be able to visit or move near them in San Jose. An emergency placement application was submitted on behalf of the maternal aunt.

3.

On April 14, 2022, the department filed original petitions alleging the children were described by Welfare and Institutions Code section 300, subdivision (g).[1] The petitions alleged that the children were left without any provision for support and mother could not be located. First amended petitions were filed on April 15, 2022, alleging the children were at substantial risk of suffering serious physical harm under section 300, subdivision (b)(1) as a result of mother's mental illness and substance abuse. The petitions alleged that mother was diagnosed with depression and anxiety 10 years earlier, but she stopped taking her prescribed medication.

At the initial detention hearing held on April 15, 2022, mother, father, stepfather, and the children were all present. Mother testified regarding the children's parentage, and she acknowledged that she lived with father during each of her pregnancies with the children. Father signed the paperwork to be placed on the children's birth certificates, and there were child support orders against father for each of the children. Mother also testified that father had not lived with the children since I.S. was four years old. Stepfather testified that he lived with mother and the children from March 2013 to May 2019, and he acted as their father during that time. The juvenile court granted mother's request for a continuance, and the children were allowed to be placed with stepfather in the children's current home in Ridgecrest. The children were ordered detained from mother's custody pending the next hearing.

On the date of the continued detention hearing, father filed Statement Regarding Parentage forms (JV-505) for each of the children. The statements indicated that the children lived with father from 2006 to 2015. Father noted that it was difficult to locate mother after their separation, and he claimed that he last saw the children approximately one year earlier.

---

[1]     Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

At the continued detention hearing, each of the parties was present and represented by counsel. The juvenile court found father to be the children's presumed father, and the children were permitted to remain with stepfather. The court also granted father's request for visitation with the children, and both parents were permitted to have supervised visitation twice per week. The children were ordered detained from mother, and a jurisdiction and disposition hearing was set for June 13, 2022.

**Jurisdiction and Disposition**

The report prepared for the jurisdiction hearing recommended that the allegations in the amended petitions be found true. Father informed the social worker that he learned about the children's removal and mother's disappearance from relatives. He reported last seeing the children approximately three years earlier, and he claimed that he was unsuccessful in his recent attempts to reach the children. Father did not know why the children did not want to speak with him, but he wanted a relationship with them. He denied that there was any past domestic violence between him and mother. Father admitted to past cocaine use, and he indicated that he had remained sober for the past six years.

Father was currently living with his wife in Bakersfield, and they had no children together. He worked graveyard shifts, and he was off work on the weekends. Father informed the social worker that he was in agreement with the children remaining in mother's care, but he requested visitation with the children.

In June 2022, father was not working because he was injured during a car accident. His parenting and child neglect course was in progress, but he had not been able to visit with the children. The children agreed to visit with father when asked by the social worker. A supervised visit took place between father and the children on July 7, 2022. Father and the children ate food together and engaged in appropriate conversation.

After the visit, father told the visitation supervisor that "he hasn't really had a relationship with the children in almost two years but that he would like to fight for them

5.

for their wellbeing." He requested four-hour visits on the weekend to prevent him from missing work. On July 29, 2022, father participated in a four-hour visit with the children. They ate food together and discussed various topics. Father hugged and kissed the children at the end of the visit, and there were no noted concerns.

The department's report for the disposition hearing recommended that the children remain in out-of-home care with family reunification services provided to mother and father. Father was recommended to participate in counseling for parenting, random drug testing, and supervised visitation at twice per week for two hours.

At the combined jurisdiction and disposition hearing held on August 9, 2022, mother and father were both present. Father's counsel submitted on jurisdiction while mother's counsel entered an objection. The juvenile court found the section 300, subdivision (b)(1) allegations in the amended petitions true. As to disposition, father's counsel submitted on the reunification plan, and he noted that father was hopeful that mother would regain custody of the children. The court removed the children from mother's custody, ordered family reunification services for mother and father, and set a six-month review hearing for February 6, 2023.

**Six-Month Review Period**

In its report for the six-month review hearing, dated January 23, 2023, the department recommended the juvenile court continue family reunification services for father. The report noted that mother passed away from suicide in August 2022. The children were given permission to visit with father on the weekend after their mother's passing. Father had completed his sixteen-week parenting program, and he had no positive drug test results. Father's wife provided supervision for the children's four-hour visits each weekend. The visits were reportedly positive, but the children still felt like father was a stranger to them. An unsupervised visit at the county fair took place in September 2022 without any concerns.

6.

The children continued to enjoy living with their stepfather at the Ridgecrest home. A physician diagnosed I.S. with moderate depression, and she was enrolled in mental health counseling. J.M. and F.S. were enrolled in mental health counseling, but they did not always attend. A social worker met with each of the children during a home visit in August 2022. I.S. was a junior in high school, and she had lived in Ridgecrest for three years. She informed the social worker that she was "doing good," and she enjoyed going to school.

J.M. was a sophomore in high school, and he enjoyed living with stepfather in Ridgecrest. He still spoke to many of his friends from when the family lived in Los Angeles, and he was able to visit them when the family travelled to Los Angeles on occasion. F.S. was in eighth grade, and he indicated that he would like to stay with stepfather. Stepfather informed the social worker that he had been around the children since they were five years old, and he intended to take the children to mother's memorial service in Los Angeles County.

In January 2023, a social worker inquired of the children about the possibility that they could be sent to live with father at the upcoming hearing. J.M. responded that he did not see himself living with father, and I.S. stated that she did not want to live with him. F.S. agreed with his siblings' comments. The children confirmed that visits were going well, and they wanted to continue to visit with father. They acknowledged feeling safe with him, but they each felt that he was a stranger to them. The social worker asked the children how they would feel if they were told to live with father, and they responded that "they would not be happy." They clarified that they would comply, but it was their hope to finish the school year with stepfather.

A home inspection of father's home was completed on January 7, 2023. The house consisted of four bedrooms and two bathrooms, and father shared the home with his wife, wife's child, brother-in-law, brother-in-law's daughter, mother-in-law, and father-in-law. The bedroom for the children contained the bottom portion of a bunk bed

7.

and large storage area with plenty of toys.  The social worker was unable to view the brother-in-law's bedroom.  The other two rooms occupied by father, his wife, and father's in-laws were observed to be clean and free of any safety hazards.  The backyard was described as "spacious," and it contained a pool.

The department concluded its assessment of detriment by noting that the children enjoyed positive visitation with father, but they felt as though he was a stranger to them. The report noted that the children preferred "to live in the community that they [knew] with their stepfather, whom they have lived with longer than with their own father."  It was uncertain if the father's home was suitable due to the four adults with uncleared background checks, and the home appeared to be "overcrowded."  The department recommended continued family reunification services to allow father and the children to develop their relationship, additional drug testing results for father, and completion of background checks for the individuals in father's home.

At the six-month review hearing held on February 6, 2023, father was present and represented by counsel.  Mother's counsel was relieved in light of her passing.  Counsel for father submitted on the department's recommendation, and he expressed his assumption that father's case plan would include developing a relationship with the children and obtaining suitable housing.  The children's counsel submitted on the recommendation, and he noted that the children were agreeable to increased visitation with father.

The juvenile court found that return of the children to father would be detrimental, and it continued family reunification services.  The court also clarified that father's case plan should concentrate on improving his relationship with the children and ensuring he had proper housing for the children to visit him in Bakersfield.  Father's progress towards alleviating or mitigating the causes necessitating placement was found to be moderate. The department was provided the discretion to increase the length and frequency of visits

or allow unsupervised visits with father. The court also ordered that father's visits could occur in Bakersfield. The 12-month review hearing was set for June 12, 2023.

**12-Month Review Period**

The department's report prepared for the 12-month review hearing, dated June 8, 2023, recommended that reunification services be continued for father. The children remained placed with stepfather in the Ridgecrest home. In February 2023, J.M. described father as a stranger, and he indicated that he only went to visits because he was ordered to by the court. F.S. agreed with J.M., and he was worried that the court was going to make him live with father. Stepfather reported that the children were doing great, but they were "a little apprehensive" about the upcoming court date. The children continued to state that they did not want to live with father during each of their monthly visits with the social worker.

An attempt was made by department staff to inspect father's home in May 2023, but he was working out of town at the time. Father believed visits with the children were going well, but he requested to have them moved to every other weekend. Father's drug test results were consistently negative.

On June 2, 2023, a social worker completed an inspection of father's home. There were no beds in the bedroom intended for J.M. and F.S., but father planned on obtaining beds that weekend. Father indicated that he would share the bedroom with J.M. and F.S. while I.S. shared a room with his wife. An alternative plan was for father and his wife to sleep in the living room while I.S. slept in father's bedroom. There were two damaged doors in the home, but no other issues or concerns were noted. A background check for the adults living in father's home found no criminal or child welfare history.

On June 6, 2023, father explained that he was visiting with the children each Sunday, and he was willing to participate in conjoint counseling with the children. He also requested overnight weekend visits with the children. The children reported that visitation was positive, but they still felt that he was a stranger to them. They went out to

9.

eat with father and watched television together at their home. The children indicated that they did not talk to father outside of visits. The department planned on starting overnight visits at father's home once he fixed the doors and arranged a place for each of the children to sleep in the home.

During the social worker's home visit in June 2023, the children explained that their visits with father usually occurred every other weekend. The children had met the individuals residing in father's home, but they did not know them well. The social worker asked if the children would be willing to participate in counseling with father, and they each declined. Each of the children were still enrolled in mental health counseling. The report noted that additional time in reunification was necessary to facilitate a transition of the children into father's home because father was not an active participant in their lives until after their removal. The department believed conjoint counseling was necessary to facilitate a successful transition.

The 12-month review hearing was held on June 12, 2023, and the children and father were present. Father's counsel submitted on the department's recommendation for continued reunification services, and he requested that the children be ordered to participate in conjoint counseling. His counsel also indicated that he hoped overnight visits would be able to start once father obtained sufficient bedding for the children. The children's counsel explained that the children were open to expanding visitation and the possibility of going to live with father. The children were not ready to move in with father, but they wanted to participate in overnight visits once the beds were ready. They were also open to engaging in conjoint counseling.

The juvenile court ordered that father was to participate in conjoint counseling with the children, and it continued father's family reunification services. An 18-month review hearing was set for October 9, 2023.

**18-Month Review Hearing**

In the 18-month review report, dated September 28, 2023, the department recommended that the children be placed with father under the provision of family maintenance services once beds were available for the children. Father was unable to participate in conjoint counseling with the children because an assessment determined that the children's mental health condition did not meet medical necessity for specialty mental health services. In July 2023, father attempted to visit with the children every weekend, but it was difficult to accomplish with his work schedule. The children described their visits with father as "ok," and they were agreeable to begin overnight visits with father on the following weekend. It was still their desire to not live with father, and they hoped to stay in their home with stepfather.

On August 23, 2023, father reported having two overnight visits with the children, but he was unable to pick them up for visits during the last couple of weeks due to car trouble. He believed the visits were "going good," and the children were content. Father took the children out for food, shopping, and other family outings.

During the social worker's home visit on August 29, 2023, the children stated that they only had one overnight visit with father because they did not want to go to his house. J.M. explained that the children were uncomfortable during the visit, and he described it as "really awkward." His siblings agreed, and they stated that they were very comfortable with stepfather and their life in Ridgecrest. The children did not want to lose their strong friendships and support system in their current community.

In September 2023, father told the social worker that the children were building more trust with him, and I.S. was reportedly getting along better with father. Father picked up the children on Friday and dropped them off on Sunday during their overnight visits. Each of the components of father's case plan was met except for the conjoint counseling that could not be arranged. An updated background check of the adults in

11.

father's home revealed no criminal records or law enforcement contacts at the home. The children were no longer receiving mental health services.

On September 26, 2023, I.S. described both the visits and individuals in father's home as "ok." J.M. felt the home was crowded, and he did not enjoy being there. Frank agreed with each of his siblings' comments. The children indicated that their overnight visits usually took place every other weekend. They did not have beds at father's home, and they were sleeping on the floor. The children were in agreement with continuing overnight visits, but they did not want to live with father. Stepfather was open to the long-term placement options of adoption or legal guardianship. He believed the children were doing well, and he wanted whatever was best for the children.

The department concluded its assessment by acknowledging that the children were not ready to live with father. However, it believed father had mitigated the concerns that brought the children to its attention, and it recognized the importance of the parent-child relationship. Based upon this analysis, it recommended that the children be placed into father's care once beds were available for the children.

At the 18-month review hearing held on October 9, 2023, father and the children were both present. Counsel for the department and father submitted on the department's recommendation. The children's counsel entered a general objection to the recommendation based on the children's stated interests, but he did not provide any further evidence or authority. He indicated that the children were not ready to make the transition to father's home, but he did not believe there was a legal basis to keep them from father.

After hearing comments from all counsel, the juvenile court reasoned as follows:

> "Okay. So this is a tough case. We've got—it's a misnomer to say they're going home, because this has never been their home. They've never lived with their dad. They've visited with their dad. He's living with his wife's family. The children have no beds there. They would be moving from the town where they've lived their whole life, I believe, Ridgecrest.

12.

"[I.S.] would be leaving in her senior year of high school to come to Bakersfield. [J.M.] is a junior in high school. And they've been through a lot, losing their mom. And [stepfather] has been a godsend, coming up and taking care of the kids, letting them stay in their home. This is their home.

"I understand the argument that there is no legal basis to keep them from their father, but I don't think in good [conscience] I can follow the recommendation. So it certainly isn't appropriate for adoption, and I don't think more time is going to change anything. I think the children need to stay where they are and visit with their [father] and it may be the wrong decision, but I can't, in good [conscience], make a different one right now.

"So, [father's counsel], I'm sorry, and you certainly are welcome to appeal this, but I can't do it. So—and, [father], it's nothing personal to you. It's just that they have their lives and you haven't been part of their lives for a long time, and the conditions aren't such that they want to leave their lives to come be in your home, at this point. So I'm not going to cut you off from them at all. I'm not going to change what's happening right now, but I cannot take them out of their home, their school, their lives at this stage in their lives, given all they've lost. And I hope that you can understand that and adjust your expectations accordingly."

Father's counsel interrupted the juvenile court to enter a general objection to the ruling. He also expressed his concern about a "financial issue" that would impact father, but he did not know the status of any child support hearings. The court acknowledged the objection and found that return of the children to father would create a substantial risk of detriment to the children.

The juvenile court stated that "[t]he detriment consists of removing them from the home they've always known. Removing them from the city they've known. Removing them from their schools, their friends, their attachments. To live in a home that's crowded with many other people, that has no beds for them .… And maybe, at some point, [F.S.] will come around and want to move to Bakersfield to be with [father]. But, at this point, I believe under the circumstances I can find a substantial risk of detriment to the children in being with their father." Father's family reunification services were terminated, and the court ordered another planned permanent living arrangement for the

13.

children's permanent plan. A review hearing pursuant to section 366.3 was set for April 9, 2024.

## DISCUSSION

Father contends the evidence was insufficient to support the juvenile court's finding that return of the children to father's home would be detrimental to their safety, protection, or physical or emotional well-being. It was insufficient, he argues, because the court based its finding on the children's dislike of father's living arrangement. Therefore, he contends, the court erred in not placing the children with him.

A.     *Legal Principles*

California's dependency system is designed to provide for the protection and safety of a minor who comes under the jurisdiction of the juvenile court and, when consistent with the minor's welfare, to preserve the minor's family ties. (§ 202, subd. (a).) At each dependency review hearing there is a statutory presumption that the child will be returned to parental custody. (§§ 366.21, subds. (e), (f), 366.22, subd. (a).) Section 366.22, subdivision (a)(1) governs the 18-month review hearing and provides: "After considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to [his or her] parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment."

"[T]he decision whether to return the child to parental custody depends on the effect the action would have on the physical or emotional well-being of the child." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) While compliance with the reunification plan is a pertinent consideration, it is not conclusive evidence that a parent poses no risk of detriment to his or her child. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704 (*Constance K.*).) When assessing whether return of child to parent would be

14.

detrimental to child, "the juvenile court's focus is properly centered on the absence or breakdown of a relationship between a particular parent and a particular child." (See *In re Cody W.* (1994) 31 Cal.App.4th 221, 225.)

Section 366.22 "does not state or imply that, in order to keep a minor out of parental custody, the serious risk of detriment posed by returning the minor to his or her parent must involve the same type of harm which formed the basis for the dependency and the removal of the minor from parental custody." (*In re Joseph B.*, *supra*, 42 Cal.App.4th at p. 898.) In determining whether there is a risk of detriment, the juvenile court considers factors, including, but not limited to:

> "[W]hether the natural parent maintains relationships with persons whose presence will be detrimental to the ward [citation]; instability in terms of management of a home [citation]; difficulties a minor has in dealing with others such as stepparents [citations]; limited awareness by a parent of the emotional and physical needs of a child [citation]; failure of a minor to have lived with the natural parent for long periods of time [citation]; and the manner in which the parent conducted himself or herself in relation to the minor in the past." (*Constance K.*, *supra*, 61 Cal.App.4th at p. 705.)

The juvenile court may also consider several other factors including: a parent's criminal history; past substance abuse or mental illness by the parent; the age of the child and any special needs that child may have; the impact of placement on the custodial parent's ability to reunify and on any sibling relationships; the nature of the relationship between the parent and the child; the parent's ability to meet the child's needs; and the child's wishes. (See *In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262 (*Patrick S.*); *In re John M.* (2006) 141 Cal.App.4th 1564, 1570–1571; *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425–1427; *In re Isayah C.*, (2004) 118 Cal.App.4th 684.) Because "[a] detriment evaluation requires that the court weigh all relevant factors to determine if

the child will suffer net harm," no one factor can be dispositive. (*Luke M.*, at p. 1425; see *Patrick S.*, at p. 1265.)

**B.      *Standard of Review***

We review a finding of detriment to determine whether the record is supported by substantial evidence. " 'We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or order is not supported by substantial evidence.' " (*In re Liam L.* (2015) 240 Cal.App.4th 1068, 1087.)

**C.      *Analysis***

Father contends the orders maintaining the children in out-of-home placement are not supported by substantial evidence. He argues that none of the reasons provided by the juvenile court were sufficient to prevent him from gaining custody of the children. He also notes that the department and children's counsel conceded the absence of detriment. However, a court is not required to follow the recommendation of a child welfare agency. (*In re Armando L.* (2016) 1 Cal.App.5th 606, 614 ["[J]uvenile court is not bound by the department's or agency's recommendation to terminate jurisdiction if there is a preponderance of evidence to justify the court retaining it and the parent, guardian, child, or social agency has met that burden."].)

Father's brief primarily addresses each of the individual factors cited by the juvenile court in isolation, and he asserts that each reason is insufficient to support a detriment finding. We find that the court's orders are supported by a number of relevant factors when considering the children's emotional well-being. Although each of these factors, if considered alone, may not warrant denial of custody, when considered as a whole, they comprise substantial evidence supporting the court's decision. (See *In re*

16.

*Luke M.*, *supra*, 107 Cal.App.4th at p. 1425 ["A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm."].)

First, father's longstanding absence from the lives of the children was an appropriate factor for the juvenile court to consider when assessing the potential detriment that placement with father would present. (See *In re A.C.* (2020) 54 Cal.App.5th 38, 43 (*A.C.*); *Constance K.*, *supra*, 61 Cal.App.4th at pp. 704–705.) I.S. told a social worker that she had not seen father since he and mother separated. It was her understanding that mother left father because he was abusive, and I.S. and J.M. both witnessed domestic violence between mother and father. Mother provided testimony at the detention hearing that father had not lived with the children since I.S. was four years old. The children initially refused to speak with father at the outset of the proceedings, and they consistently referred to him as a "stranger" throughout the reunification period.

It is true that, two months after the children's removal, father began to participate in visits with the children, and he eventually completed the components of his case plan. Although his efforts were commendable, they did not require the juvenile court to discount father's years of absence. (See *Constance K.*, *supra*, 61 Cal.App.4th at pp. 705–709.) In addition, father's failure to establish a parental relationship with the children during the 18-month reunification period was a direct result of his failure to be involved in the children's lives over the past decade. Thus, the court properly considered father's lack of prior involvement with the children.

Next, father argues that the children's transition from their home with stepfather was not sufficient to support a finding of detriment. He also asserts that the juvenile court could not make its detriment finding because the parent seemed less capable than an available family member. In support of this argument, father cites to the Supreme Court's decision in *In re Jasmon O.* (1994) 8 Cal.4th 398 (*Jasmon O.*). However, *Jasmon O.* is inapposite.

17.

In *Jasmon O.*, the appellate court had held that the child's "mental distress" at the prospect of being taken from her foster parents "could not properly be the basis for the referee's decision on the question of the child's best interests under section 388," citing *In re Venita L.* (1987) 191 Cal.App.3d 1229. (*Jasmon O.*, *supra*, 8 Cal.4th at p. 417.) After summarizing *Venita L.* and discussing some contrary authority, the Supreme Court concluded: "We have no quarrel with the assertion that the existence of a successful relationship between a foster child and foster parent cannot be the sole basis for terminating parental rights or depriving the natural parent of custody in a dependency proceeding. The evidence here was of a different order. " (*Jasmon O.*, at p. 418.) Accordingly, the portion of *Jasmon O.* on which father relies is by no means a holding of the case.

At most, the Supreme Court in *Jasmon O.*, *supra*, 8 Cal.4th 398 warned that courts "should carefully evaluate whether a child's distress in severing a temporary bond is simply situational, and not base their decisions on a transitory problem .…" (*Id.* at pp. 418–419.) In contrast here, the children already had a preexisting relationship with stepfather prior to the dependency. Stepfather testified that he lived with mother and the children from March 2013 to May 2019, and he fulfilled the role of a father during that time. The children indicated that stepfather still visited with them after his separation from mother. The juvenile court's conclusion that the children should not be "take[n] out of their home, their school, their lives at this stage in their lives," after the loss of their mother, was not improper. (*Jasmon O.*, at p. 419 ["[C]ourts may place great weight on evidence that after a substantial period in foster care, the severing of a bond with the foster parents will cause long-term, serious emotional damage to the child. [¶] … [¶] Children are not simply chattels belonging to the parent, but have fundamental interests of their own that may diverge from the interests of the parent."].)

In its proper context, we do not believe that the juvenile court based its decision on father being less capable to care for the children than stepfather. There was no evidence

that father lacked the resources to procure bedding for the children. The court merely acknowledged that father put in minimal effort to get his home ready for the children to move in. Father's failure to procure beds for the children is indicative of his general lack of commitment to the children over the majority of their lives. It is an unfortunate reality that father was unable to overcome the strong bond that the children had developed over several years with the person who stepped in to fill the role of a father. The children already endured the recent loss of their mother, and it was more than reasonable for the court to consider their relationship with the individual who had fulfilled the role of a parent for a substantial period of time.[2]

Father also cites to *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789 and *In re Yvonne W.* (2008) 165 Cal.App.4th 1394. Neither of these cases mandates a different outcome. *David B.* held that the juvenile court erred in not returning a child to his parent when the parent had done "virtually everything [the department] requested of him, and then some" and the sole potential detriment came from another adult living in the parent's household and the parent's inability to recite the details of the child's preferences. (*David B.*, at pp. 772, 790–794.) *Yvonne W.* held that the court erred in not returning a child to her parent simply because the parent lived in a shelter. (*Yvonne W.*, at pp. 1401–1403.) The present case rests on more significant detriment than a housing preference or home arrangements.

---

[2]     We also note that it is possible that stepfather had met criteria for presumed father status pursuant to Family Code section 7612, subdivision (c), which provides: "In an appropriate action, a court may find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child. In determining detriment to the child, the court shall consider all relevant factors, including, but not limited to, the harm of removing the child from a stable placement with a parent who has fulfilled the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time."

Finally, father contends that the children's preference to remain in their current home is insufficient to establish detriment. He primarily relies upon the case of *Patrick S.* to support this claim. In *Patrick S.*, the juvenile court, at disposition, found that placement of a 13-year-old child with his father out of state would create a substantial risk of detriment to the child's "emotional well-being" based on "the totality of circumstances, including [the child's] wishes, his anxiety about moving to his father's home, his need for continued therapeutic services, the lack of an established relationship with his father and stepmother, [the father's] scheduled [military] deployments and his plan to homeschool [the child], and the lack of available child welfare services in the father's home state." (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1262.)

At the time of the dependency proceedings, the child was enrolled in home independent study and was living in a foster home. (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1257.) The child had behavioral issues and no friends. (*Id.* at pp. 1257, 1259.) Before the disposition hearing, the child visited his father's home in Washington for several weeks and made some friends during the visit. (*Id.* at p. 1258.) The child was able to converse freely with his father after the visit. (*Ibid.*) At various points leading up to the disposition hearing, the child had differing perspectives about his father, saying he preferred living with him, was resigned to living with him, did not want to live with him, and had anxiety about living with him. (*Id.* at pp. 1258–1260.) To ease the transition and support his son, the father researched schooling options for the child in Washington, arranged individual and family therapy, joined a parenting class, and set up an internship with an architect for the child, consistent with his interests. (*Id.* at p. 1260.) The father also offered to facilitate contact and visitation with the child's mother. (*Ibid.*)

The appellate court concluded this evidence was insufficient to establish detriment. (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1263.) The court observed, among other things, that the father "paid child support every month for 11 years without knowing where his son was. He searched for him for years. When he learned of his

20.

son's whereabouts, [the father] immediately came forward and requested placement, attended all significant hearings in the dependency proceedings, visited and contacted his son whenever possible, looked into obtaining recommended services for [the child] and his family through the Navy and his church, and participated in recommended services." (*Id.* at p. 1263.)

Most importantly, the appellate court observed that "a child's preference is not the deciding factor in a placement decision, even when that child is a teenager," because "[t]he liberty interest of a minor is not coextensive with that of an adult." (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1265.) In addition, the court explained, the juvenile court erred in focusing on the child's "short-term emotional needs," when it should have "placed greater weight on the long-term benefits [the child] would gain" from being placed with "a competent, caring parent who desire[d] to assume custody of him." (*Ibid*.)

Unlike the circumstances in *Patrick S.*, where the evidence demonstrated that the lack of a relationship between the father and the child was not the father's fault, the juvenile court here could reasonably infer that father was responsible for his lack of contact and relationship with the children. Father made conflicting statements about his most recent contact with the children, and he claimed it was difficult to contact mother after their separation. However, his family members were able to contact him about the children's removal and mother's disappearance shortly afterwards.

Furthermore, father did not request placement of the children at disposition where the department must demonstrate clear and convincing evidence of detriment. (§ 361.2, subd. (a); *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1829 ["[T]o comport with the requirements of the due process clause, a finding of detriment pursuant to section 361.2, subdivision (a) must be made by clear and convincing evidence."].) Instead, he gradually increased his frequency of visitation until he asked for his visits to decrease to every other weekend in May 2023. Father did not contact the children outside of their visits, and the children consistently asserted their desire to remain in their home with stepfather.

Although father did not have any documented criminal history, both I.S. and J.M. reported witnessing domestic violence between father and mother. Thus, father's level of competence and commitment does not match the efforts exerted by the father in *Patrick S.*

We find the case of *A.C.*, *supra*, 54 Cal.App.5th 38 compares more favorably to the present situation. The minor in *A.C.* was 12 years old, lived with her grandmother, and last had contact with her father, who lived out of state, five years earlier. (*Id.* at pp. 40, 44.) The minor, like the children, viewed her father as a stranger, while she was comfortable with her maternal family and life. (*Id.* at p. 41.) Under those circumstances, the juvenile court found placement with the father would be detrimental. (*Id.* at pp. 43–44 [minor feared leaving her life to be with her father, leading to anxiety and impacted sleep; wanted to reunify with her mother and was bonded with her family; and had many friends and did well in school]; *id.* at p. 41 [therapist and multidisciplinary assessment team felt moving her would cause emotional detriment].) The appellate court affirmed, rejecting the father's arguments that the minor's wishes were not dispositive and that the court relied either on the absence of a relationship or an impermissible mix of factors. (*Id.* at p. 43.) The appellate court explained that, while the minor's wishes were still relevant, the basis for the detriment finding was that she "would experience something akin to trauma" if placed with the father, and the evidence amply supported detriment. (*Ibid.*)

Here, the juvenile court's detriment finding primarily relied upon father's neglect of his relationship with the children, the emotional trauma related to the potential removal of the children from their family home and remaining parental figure, and the children's desire to remain in their current community and support system as they approached the age of majority. These children had an even greater need for stability than the child in *A.C.*, given the traumatic and still recent loss of their mother. The court reasonably

observed that placement with father posed a substantial risk to their emotional well-being, even where father and his home did not pose a risk of physical harm.

We appreciate father's suggestion that each factor viewed independently may not by itself comprise evidence supporting a detriment finding, but the juvenile court does not view each factor in a vacuum in making a detriment finding; rather, it is to weigh *all* relevant factors to determine whether the children will suffer net harm. (*A.C.*, *supra*, 54 Cal.App.5th at p. 46 ["the court's inquiry properly is more comprehensive than simply whether a child will be physically safe with a noncustodial parent or whether that parent has behaved badly."].) Accordingly, we conclude the court's finding placement with father would be detrimental to the children was supported by substantial evidence.[3]

## DISPOSITION

The orders appealed from are affirmed.

---

[3] We acknowledge that a child's biological father is an important figure in his or her life, and we encourage father to continue making efforts to develop a relationship with the children as they mature into adulthood.

23.