Filed 10/14/24  In re A.G. CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ALFONSO G., <br><br> Defendant and Appellant. | F087616 <br><br> (Super. Ct. No. JD144977-00) <br><br><br> **OPINION** |

<u>**THE COURT**</u>*

APPEAL from an order of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Jennifer E. Feige, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

\*      Before Peña, Acting P. J., Meehan, J. and DeSantos, J.

In this juvenile dependency case, Alfonso G. (father) appeals from the juvenile court's dispositional order denying him placement of his minor son, A.G., of whom he was a noncustodial parent, pursuant to Welfare and Institutions Code[1] section 361.2. Father contends the court's finding that placement would be detrimental to A.G.'s well-being was not supported by sufficient evidence.

Finding no error, we affirm the juvenile court's dispositional findings and orders.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 5, 2023, the Kern County Department of Human Services (department) filed a juvenile dependency petition on behalf of then eight-year-old A.G. alleging he came within the court's jurisdiction under section 300, subdivision (b)(1). The petition alleged he was at risk of harm because of mother's failure to protect him due to her substance abuse and mental health issues. At the time the petition was filed, it was unknown to the department who A.G.'s father was. Mother had reported he "disappeared" four years prior and indicated he had perpetrated domestic violence against her. The maternal uncle identified father to the department but did not know his whereabouts or how to contact him.

A.G. and his three siblings, who were in mother's care and not subjects of this appeal, were placed into protective custody. A.G. was placed with one of his siblings in a resource family home. His other two siblings were placed in a separate placement with a relative.

At the detention hearing conducted on September 7, 2023, the court added father's name to the petition as an alleged father and found his whereabouts were unknown. Minor's counsel noted the older siblings were upset the younger siblings, including A.G., were not placed with them. Some discussion was had on the record about the possibility

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

of them being placed together and the court noted it seemed the children were "a very bonded sibling group." The court ordered A.G. and his siblings detained from mother and that sibling visits were to occur weekly for two hours.

Later in September 2023, father, who was located living in Washington State and still an alleged father at that point, reported to the family finding social worker that he was interested in permanent custody of A.G. and was advised to reach out to the primary social worker. Father later reported to the social worker he lived with mother during her pregnancy and the first two years of A.G.'s life in Kern County. His and mother's relationship ended in 2017, at which point father moved to Washington, where he had lived for the past five years. Father had not seen A.G. or had any contact with him since moving to Washington. Father expressed he was willing to complete parenting/child neglect counseling and comply with the department's recommendations. He wanted to be a part of A.G.'s life. Father denied having substance abuse or mental health issues. He reported he had stable housing and was employed and capable of financially supporting A.G.

A.G. began participating in weekly two-hour visits with his siblings and mother. He was reported to cry during visits because he did not want to be separated from his older sister and wanted to go home with mother and his family. A.G. was generally doing well in placement, though his care provider noted he lacked independent hygienic skills and was very behind academically and needed help to complete his homework. A.G. reported feeling safe, liking school, and enjoying visiting with mother.

On October 10, 2023, father, as well as mother, made their first appearances in court. The court heard testimony from mother on the issue of paternity. Father was appointed counsel and through counsel requested to be elevated to presumed father and presented the court with a statement regarding parentage. The court declared father to be presumed father. Father requested virtual visits with A.G. as he lived out of state. The court ordered twice weekly half-hour visits by telephone or video chat.

In its jurisdiction report, the department reported that in 2015, it had received a referral alleging general neglect and emotional abuse due to domestic violence between mother and father, with father as the perpetrator. The referral was determined to be inconclusive as contact with the family could not be made to investigate. Father had a minor criminal history consisting of misdemeanors, the most recent of which was from 1996.

Mother and the children continued to visit regularly. A.G. still struggled with leaving visits with his mother and his siblings and was comforted by mother or his older sister when he was crying at the end of visits; after one visit he could not stop crying and initially would not enter the care provider's vehicle. A.G. reported to the social worker he liked his placement, enjoyed school, and wanted to see mother and his siblings. He stated if he could not return to mother, he wanted to live with his aunt, as they used to live together. A.G.'s care provider reported A.G. had previously mentioned he wished he had a father.

In October 2023, the social worker arranged virtual visits between father and A.G. During the first visit, father asked A.G. if he remembered him, and A.G. was silent. Father said he wanted A.G. to be with him and that he loved him. A.G. said he loved father as well. Father asked A.G. if he wanted to see him in person, and A.G. shook his head no. Father kept the conversation going, but A.G. was quiet and would respond with short answers or remain silent.

During subsequent visits, father continued to attempt to keep conversations flowing, and A.G.'s participation varied between not responding and engaging in some conversation. As the visits progressed, A.G. frequently asked how much time was left in the visit and would count down the minutes until it was over. Father would occasionally ask A.G. things like whether he missed him, wanted to see him in person, or live with him, and A.G. would consistently answer no.

4.

A jurisdiction/disposition hearing was conducted on November 1, 2023. Father submitted the matter as there were no allegations against him. The juvenile court found the allegations set forth in the petition true and that A.G. and his siblings were described by section 300, subdivision (b). The court continued the matter as to disposition.

Later in November 2023, during a home visit by the social worker, A.G. reported to the social worker he was doing well in the care provider's home and doing better in school. The social worker noted to A.G. that he sometimes asked how much time was left in visits with father and advised A.G. that the visits were for him to speak with his parents and catch up, and further that, given his age, if he did not want to attend visits, he did not have to. The social worker asked him how he felt when father talked about A.G. coming to live with him, and A.G. responded that it made him feel sad because he did not want to live with father as he did not know him. He would prefer to live with his care provider if he was given a choice.

A.G. subsequently began to decline to visit with father. He reported to the social worker he felt uncomfortable and did not like the visits. When pressed further as to why, he said he did not know. Though the social worker encouraged A.G. to visit, he frequently refused. When informed that A.G. would not be visiting, father generally stated he would be patient and wait until A.G. was ready. A.G. visited with father once in December 2023, and during the visit, father told A.G. he missed him and asked A.G. if he missed him, and A.G. was silent before saying no. Father engaged A.G. about school, and they talked about Christmas.

In December 2023, A.G.'s care provider reported he was doing well and had improved in his personal skills. A.G. was receiving mental health services. A.G. reported he liked his placement and wanted to live with his aunt.

Later that month, A.G. and his sibling with whom he was placed were moved to his aunt's house. After being moved, A.G. started displaying behaviors such as urinating in inappropriate places. A.G.'s older sister, who lived with his aunt as well, started

5.

having conflict with the aunt regarding how she was parenting A.G. and his other sibling and absconded from the home to live with another relative. She still attended visits, however.

Ahead of the disposition hearing, the department was recommending A.G. and his siblings be removed from mother's custody, and that both mother and father be provided with family reunification services. Father's case plan was to consist of counseling for parenting/child neglect.

The disposition hearing was conducted on January 29, 2024. Father called the social worker to testify. She testified that her recommendation for father was reunification services, and her recommendation not to place A.G. with father was based on the fact that A.G. has not wanted to attend some visits with father and the possibility of how being separated from his siblings would affect him emotionally. She believed it could be detrimental to A.G. to be separated from his siblings. She testified that as far as evaluating father for placement, she had reviewed the virtual visits and how they had been going. She had not talked to father about his housing situation or evaluated whether he posed any kind of risk to A.G. The department had not received a criminal history for father and had not located any CPS history for him. She had not observed any problem with A.G. and father's visits.

Following the social worker's testimony, father's counsel requested the hearing be continued and that the department be ordered to conduct an evaluation of father's residence for placement. The court denied the request.

Father subsequently took that stand and testified he lived with A.G. for about two years after he was born. When father and mother's relationship ended, he was the one who left the house and moved to Washington. He did not try to take A.G. with him because he was too young, and he did not want to take him away from mother. He asked mother to take good care of him and later tried to speak to her, but it "wasn't possible." When asked if he tried to visit with A.G., he said he "spoke to [mother] on the phone and

she mistreated [father]" and told father he had to forget about A.G.  She blocked his number from being able to call her.  He did not support A.G. after separating from mother because she did not allow him to.  He did not write because he did not know where to send letters.

Father testified his sister tried to communicate with mother, but mother became aggressive with her and did not allow her in the house.  Father's adult daughter had taken some pictures of A.G. and sent them to father.  His daughter would run into mother at the store because they lived in the same city.

Father testified he had recently started visiting with A.G. more, and the visits were going well.  He further testified he had no criminal history.  He lived in a two-bedroom home with furniture by himself and wanted A.G. to come live with him.  He had checked out the schools in his area, and there was one close to his house.  He worked only during school hours, and during the summer he had people who could watch A.G. while he is at work.

Following the testimony, father's counsel requested father be granted placement with family maintenance services.  Mother's counsel objected to the request, arguing A.G. had grown up around his siblings and enjoyed their relationship and was familiar with his school.  Minor's counsel also objected, stating that A.G. did not wish to live with father at that time and that two of his older siblings also objected to A.G. being placed with father.  County counsel argued it would be emotionally detrimental to A.G. to be placed with father at the time given he had a "full family … here including and most importantly his siblings."

After hearing the arguments, the court found it would be detrimental to A.G.'s emotional well-being to be placed with father.  The court noted A.G.'s consistency with not wanting to visit with father; their lack of relationship; and that A.G. was receiving mental health services, for which the court had no evidence as to father's plan to continue those services.  The court further stated A.G. was bonded with his siblings and was not

7.

bonded with father "at all." The court concluded by saying, "The hope is that as this case goes on and perhaps at some point, the hope is that the visits become stronger, the bond is created and over time becomes stronger. But right now, there is no bond. I would essentially be sending [A.G.] to live with a stranger that he has said repeatedly he does not wanna visit and he doesn't wanna talk to."

The court adjudged A.G. and his siblings dependents of the court and removed them from mother's custody. The court denied father's request for placement of A.G. The court ordered reunification services to both of A.G.'s parents with father's case plan consisting of counseling for parenting/child neglect. The court ordered the department to have discretion to increase father's visits.

## DISCUSSION

When a child is removed pursuant to section 361, and a noncustodial parent requests custody of the child, "the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) The court's detriment finding must be made by clear and convincing evidence, and in making the finding, "the court weighs all relevant factors to determine if the child will suffer net harm." (*In re A.C.* (2020) 54 Cal.App.5th 38, 43 (*A.C.*).)

"We review the entire record in the light most favorable to the court's order to see whether substantial evidence supports the finding." (*A.C.*, *supra*, 54 Cal.App.5th at p. 43.) In evaluating the record for substantial evidence, we must account for the clear and convincing standard of proof. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) Thus, the ultimate question before us is "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Ibid*.)

Here, in making its determination, the court appeared to rely primarily on father and A.G.'s lack of relationship, A.G.'s wishes not to visit with father, and A.G.'s bond

with his siblings. These were all proper factors for consideration. (See *A.C.*, *supra*, 54 Cal.App.5th at p. 43 [absence of a relationship and a child's wishes, while not determinative on their own, are proper factors for consideration]; *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1422–1423 [sibling bonds may be properly considered in determining detriment].)

Father acknowledges these factors were proper for consideration but asserts that none rose to the level of proof of detriment, as none of them are determinative factors. While we accept father's assertion for the purpose of his argument that none of the factors by themselves may have been sufficient to support a detriment finding, we reject his suggestion that the combination of factors here did not support the court's finding. The juvenile court was tasked with evaluating all relevant factors to determine net harm, and we are to look at whether the entirety of the record supports the court's finding. Here, we do not find the juvenile court improperly relied on only one factor, and on balance, we conclude substantial evidence supported the juvenile court's findings that placement with father would be detrimental to A.G.'s emotional well-being.

Father moved out of state when A.G. was two years old and did not have any contact with him nor provide for him for the subsequent five to six years of A.G.'s life. While father contends mother thwarted all of his efforts to have a relationship with A.G., there is no evidence father made any effort to seek a visitation or custody order in family court or do anything else to have a relationship with A.G. (Cf. *In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1263 [no substantial evidence to support detriment due to lack of relationship where the father paid child support every month for 11 years and actively searched for the child by hiring attorneys and a private investigator, contacting the mother's relatives, federal and state law enforcement, and child welfare agencies, and visiting locations where he thought he might find the child].)

Visitation during the dependency proceedings had not yet repaired father's relationship with A.G., as A.G. consistently did not want to visit with father and told the

social worker it made him feel sad when father talked about A.G. coming to live with him because he did not want to.

A.G. was placed with one of his siblings and often cried when he had to leave visits with his other siblings and mother, and the social worker testified A.G. would suffer detriment if separated from his siblings. While A.G.'s recent change in placement did appear to result in some behavioral issues and conflict between his older sister, with whom he seemed particularly attached, and his care provider, we do not find this evidence compelled the juvenile court to place him with father. Rather, in drawing reasonable inferences in favor of the judgment, we find a new change in placement—particularly one to a different state which would have disrupted A.G.'s visits with mother and his siblings—could have been more distressing to A.G., considering the change in placement was so recent, A.G. had indicated he wanted to live with his aunt, and A.G. was receiving ongoing mental health services.

The juvenile court could reasonably conclude placement with father at this particular point in the proceedings would harm A.G., as A.G. (1) did not know father, which father was mostly, responsible for; (2) did not want to visit or live with father; (3) had a close relationship with his siblings and enjoyed his visits with mother, which a move out of state would have disrupted; and (4) had behavioral/mental health issues, for which he was being treated.

Father spends much of his briefing asserting that he is a capable parent with no child welfare referrals or serious criminal history, who was employed and had stable housing and had adult children. Father acknowledges he was not in contact with and did not support A.G. but asserts this was because of mother. He further contends the evidence supports that he was capable of providing for A.G.'s emotional well-being. We note that the juvenile court's determination, as well as our review, was focused on A.G.'s emotional well-being. The court's decision to decline placement with father, even assuming he was a safe and nonoffending parent, was proper because it found the

10.

placement would be detrimental to A.G.'s emotional well-being. (See *A.C.*, *supra*, 54 Cal.App.5th at p. 46 ["the court's inquiry properly is more comprehensive than simply whether a child will be physically safe with a noncustodial parent or whether that parent has behaved badly"]; see also *In re C.C.* (2009) 172 Cal.App.4th 1481, 1490–1491 [court has broad discretion to evaluate child's emotional well-being; finding a placement would impair the child's emotional security may suffice in appropriate cases].) As such, for the reasons we have stated above, the juvenile court's finding was appropriate, despite father's apparent capability as a parent and any evidence he could point to supporting that he could provide for A.G.'s emotional needs. (See *In re D.D.* (2019) 32 Cal.App.5th 985, 990 [substantial evidence standard of review requires affirmance of a finding supported by substantial evidence even if other evidence supports a contrary finding].)

None of the cases father cites persuade us to come to a different conclusion. Father likens his case to *In re C.M.* (2014) 232 Cal.App.4th 1394 (*C.M.*). In *C.M.*, a 12-year-old minor had been the subject of various dependency referrals prior to being removed from the mother's care. During the investigation of these referrals, the minor told the social worker she saw her father on weekends and "things were better" at his house, but that she did not want to live with him. (*Id.* at p. 1397.) A few months later, when the minor again spoke to the social worker, she stated she had frequent telephone calls with her father and unmonitored overnight visits for holidays, which she enjoyed. The minor's therapist encouraged these contacts. (*Ibid.*) After being removed from mother's custody, the minor was placed with the maternal grandmother. At disposition, the noncustodial father requested placement. The juvenile court denied the request, noting the minor was uncomfortable with the father as she had never lived with him, but it made no finding of detriment. (*Id.* at p. 1400.) The appellate court found the minor's wishes to remain with maternal grandmother, the lack of an established relationship with the father, her desire not to be separated from a half sister, or the fact that the minor would be in stepmother's care much of the time due to father's work schedule were

insufficient to constitute substantial evidence "of the high level of detriment required under section 361.2(a)." (*Id.* at p. 1403.) The appellate court reversed the dispositional order and remanded for a new dispositional hearing. (*Id.* at pp. 1404–1405.)

Father also likens his case to *In re John M.* (2006) 141 Cal.App.4th 1564 (*John M.*). In *John M.*, the juvenile court found placement of a 14-year-old child with his out-of-state father would be detrimental; it reasoned the child had "serious problems" that could be treated where he currently lived, had a sibling relationship with his 10-month-old sibling and extended family, did not have an "ongoing relationship" with his father, and did not wish to move as he wanted to live with his aunt with whom he was placed. (*Id*. at pp. 1568–1570.) The appellate court found these factors did not support the court's detriment finding, reasoning the child had only been detained with his sibling for 16 days, there was no evidence that moving away from his extended family would be detrimental nor that it would prevent his mother from reunifying with him, and the child's wishes were unclear as to whether or not he would want to live with the father. (*Id*. at pp. 1570–1571.) As for the lack of relationship between the father and child, the father had been out of contact with the child for four years, but the court found the father was not to blame, and the father and child had been in contact for a year before the dependency proceedings were filed. (*Id*. at p. 1571.)

These cases are distinguishable. Unlike the child in *John M.*, A.G. had an established relationship with his siblings, with whom he had lived for most of his life, and the evidence showed he was attached to them. In addition, where the child in *John M.* had an established relationship with his father despite a short period of no contact and was more ambivalent about living with him, A.G. clearly and consistently expressed his wishes to not live with father and had not had contact with father for most of his life and did not remember ever living with him. The relationship between the father and child in *C.M.* is similarly distinguishable as the child also had an established relationship with her

father and, while she did not want to live with her father, she was open to overnight visits.

We acknowledge father came forward immediately to seek custody of A.G. and there does not appear to be any evidence he was not capable of providing for A.G.'s physical needs, and we commend him for being patient with A.G. as he attempts to reforge a relationship with him. At the stage of the disposition hearing, however, for the reasons we have stated, the juvenile court was not unreasonable in determining placement would be detrimental to A.G.'s emotional well-being. We express no opinion on how the juvenile court should rule on any future requests for modification or placement father may make.

## **DISPOSITION**

The juvenile court's dispositional findings and orders are affirmed.