Filed 4/1/26  In re D.M. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re D.M., a Person Coming Under the Juvenile Court Law. | B347131 |
| _____ | (Los Angeles County Super. Ct. No. 25CCJP00723) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| Y.V., | |
| Objector and Appellant; | |
| D.M., a Minor, | |
| Respondent. | |

Appeal from orders of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Reversed.

Lori London, under appointment by the Court of Appeal, for Objector and Appellant Y.V.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Respondent D.M., a Minor.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Courtney Fisher, Deputy County Counsel, for Plaintiff and Respondent Los Angeles County Department of Children and Family Services.

_____

In March 2025, the Los Angeles County Department of Children and Family Services (DCFS) filed a Welfare and Institutions Code[1] section 300 petition alleging that Y.M. (Father), who resides in California, had physically abused his then-nine-year-old daughter, D.M.  The petition did not include any allegations against D.M.'s mother, Y.V. (Mother), who resides in Honduras.

The juvenile court sustained the allegations against Father and removed D.M. from his custody.  Father waived his right to reunify with D.M. and told the court he was not interested in regaining custody.  Mother requested that the court place D.M. with her in Honduras, pursuant to section 361.2, subdivision (a).  That subdivision requires the court to place a child with a nonoffending, noncustodial parent unless the court finds by clear and convincing evidence "that placement with [the] parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."  (§ 361.2, subd. (a).)

To aid it in evaluating possible detriment, the juvenile court ordered DCFS to interview Mother, Father, and D.M. about "[e]ach of their respective positions concerning whether [D.M.] remains in the [United States] or returns to her home country," and about the "nature and quality of [the parents'] visitation" with D.M.  DCFS,

_____

[1] Further statutory references are to the Welfare and Institutions Code.

2

however, failed to do so.  Notwithstanding this failure, the court went forward with the disposition hearing and denied Mother's request for placement.  The court noted that D.M. "ha[d] a [removal] action pending in . . . immigration court," and found that placement in Honduras "would be detrimental not just to [D.M.'s immigration] case, but also to the relationships she's established here [in the United States]."  The court then entered dispositional orders removing D.M. from both parents and ordering Mother to complete a case plan.

Mother now asks us to reverse the orders.  She argues D.M.'s immigration proceedings cannot support a section 361.2, subdivision (a) detriment finding, and that no other clear and convincing evidence supports the finding.  Neither DCFS nor minor's appellate counsel contends that a juvenile court may rely on a child's pending immigration proceedings to support a detriment finding.  But they insist other evidence in the record— including a representation by minor's trial counsel that D.M. did not wish to return to Honduras—adequately supports the finding here.

The record, however, demonstrates the juvenile court focused primarily on D.M.'s immigration proceedings in conducting the detriment analysis.  And we conclude the remaining evidence on which DCFS and minor's counsel relies is insufficient to support the detriment finding.  Accordingly, we reverse and remand for a new dispositional hearing.

## FACTUAL AND PROCEDURAL SUMMARY

We summarize only the facts and procedural history relevant to our resolution of this appeal.

3

## A. DCFS Referral and Resulting Investigation

On March 6, 2025, DCFS received a referral alleging that D.M. had suffered physical abuse. The caller reported that D.M. had purple and blue bruises on her arm, as well as marks that looked like scratches. The caller further reported that D.M. said she "didn't eat the other day" because her stepmother had "told her to make her own food."

A social worker, as well as law enforcement, visited D.M.'s home to investigate the referral. D.M. shared the home with Father, stepmother, two younger half siblings (the biological children of Father and stepmother), and several nonrelative roommates.

Father reported that he and D.M. originally are from Honduras, and that Mother still resides there. He and Mother separated when D.M. was one year old. Father "was not allowed to see [D.M.] for a while," but "later, [D.M.]'s maternal grandmother . . . called [him] to report that [Mother had] left [D.M.] with her and left with her new boyfriend." Maternal grandmother "asked . . . [F]ather to pick [D.M.] up because she could not care for her." He "agreed and has had [D.M.] since [she] was two or three." Father said he did not have Mother's mailing address or phone number and had no means of contacting her.

Stepmother reported that she, Father, D.M., and D.M.'s half siblings came to the United States in 2022. She further reported that Mother "sometimes call[ed] [D.M.]" In addition, stepmother shared that "she nearly left the relationship with . . . [F]ather because of the issues with [D.M.]," but "reconsidered when [D.M.] started therapy." The social worker later obtained medical records indicating D.M. had been diagnosed with "oppositional defiant disorder, conduct disorder unspecified, sleeping disorder, unspecified urinary incontinence, acute stress reaction, depression,

4

decrease[d] appetite, other feeding difficulties, failure to thrive, superficial burns, sleep disturbance, attention deficit hyperactivity disorder[ ] (combined type), nonpsychotic mental disorder, unspecified mood disorder, major depressive disorder[,] and underweight." (Capitalization omitted.) The records further indicated a medical provider had prescribed D.M. Adderall and Clonidine, among other medications.

As to the allegations of physical abuse, Father initially denied that he harmed D.M. intentionally. Upon further questioning, however, Father admitted that he struck D.M. with an extension cord because she had urinated in her bed. He insisted that "he only hit her once" and that "this was an isolated incident." Stepmother told social workers she was unaware of the bruising on D.M.'s body. She explained, "I don't check her. I don't touch her because I don't want her to say that I touch her."

A physical examination of D.M. by law enforcement revealed that, in addition to the bruises on her arm, she had a bruise above her right breast and a large bruise on her upper right thigh that appeared to be "from a solid object." In the social worker's view, "the injuries appear[ed] to indicate that [D.M.] was struck multiple times with an object rather than the single . . . incident [Father] described."

DCFS detained D.M. and her half siblings from Father and stepmother on an emergency basis. The social worker placed D.M. with a foster caregiver. The foster caregiver told the social worker that, if reunification efforts failed, she would like to keep D.M. in her home.

### B. Section 300 Petition and Adjudication Hearing

Five days later, on March 11, 2025, DCFS filed a section 300 petition on behalf of D.M. The petition alleged that Father had

physically abused D.M., and that the abuse placed her at serious risk of harm. (See § 300, subds. (a) & (b)(1).) At the initial hearing on the petition, Father appeared, represented by counsel. DCFS was unable to contact Mother in advance of the hearing, and she did not appear. The court ordered that D.M. remain detained from Father, and set the adjudication and disposition hearing for May 7, 2025.

Two days before the scheduled hearing, Father told the social worker he had obtained Mother's contact information, which he provided. The social worker interviewed Mother telephonically. Mother confirmed that she lived in Honduras. She told the social worker that, before DCFS began its investigation, she had calls with D.M. at least once a week and sometimes "more frequently/daily." Mother further reported that, after DCFS removed D.M. from Father's care, Father and stepmother stopped answering Mother's calls. Mother said that she was unaware of Father's physical abuse of D.M., and that "[D.M.] never said anything about being hit or mistreated." As to D.M.'s placement, Mother told the social worker she " 'would like to wait and see what happen[ed] prior to making a decision on D.M. returning to [her in Honduras] or to a relative in the United States.' "

At the May 7 hearing, both Father and Mother appeared. The court sustained the petition's allegations against Father, finding in pertinent part: "The bruises on [D.M.] have history. Some are healed, some are more recent. . . . [¶] . . . [¶] The juxtaposition [with] the other children who are not subject to this kind of behavior is . . . eviden[ce] that [D.M.] is being singled out for this type of abusive treatment . . . . [¶] Father's fanciful explanation for the [extension cord] dropping and landing on [D.M.] and then later on acknowledging that he struck [D.M.] with the

6

[cord] is concerning. . . . [¶] . . . [¶] . . . [T]he evidence suggests that . . . manufactured stories . . . came from . . . Father and the stepmother."

The court then asked Mother for her position concerning D.M.'s placement. Mother's counsel responded: "[A]t this point in time, [Mother] is okay with where the minor is currently at[,] . . . but would like to ask for the return of the minor to her in her home country."

Minor's trial counsel told the court that Mother's request raised "immigration implications," and the court continued the disposition hearing to May 30, 2025, to permit counsel adequate time to discuss those issues with D.M.

The court later continued the hearing a second time, to June 6, 2025, and granted Mother's counsel's request that DCFS conduct supplemental interviews of Father, Mother, and D.M. "about [D.M.'s] possible return to Honduras and what their relationship was like, each . . . parent and [D.M.], before coming here to America." The court ordered DCFS to interview the parties about the "nature and quality of visitation" and "[e]ach of their respective positions concerning whether [D.M.] remains in the [United States or] returns to her home country." The court further ordered DCFS to file a report summarizing the interviews in advance of the hearing.

## C.    Disposition Hearing

In preparation for the June 6 disposition hearing, DCFS filed two "last minute information" reports identifying a family friend and a maternal uncle (both living in the United States) as possible placements for D.M. (Boldface & capitalization omitted.) But neither report included the information the court had ordered DCFS to provide—namely, summaries of supplemental interviews

7

with the parties concerning visitation and the parties' positions concerning D.M.'s possible return to Honduras.

Notwithstanding DCFS's failure to provide any information responsive to the juvenile court's order, the court went forward with the disposition hearing. At the hearing, Father waived his right to reunification services and submitted a form JV-195 in which he attested he did not wish to have D.M. returned to his custody.

Minor's counsel urged the juvenile court to keep D.M. in her foster care placement in the United States, insisting that placement with Mother would result in detriment. Minor's counsel acknowledged that DCFS had failed to conduct the court-ordered "interview of [D.M.] reflecting on her past experience of living with Mother in Honduras." But "as an officer of the court," minor's counsel represented that D.M. "ha[d] disclosed to [him] that previously she did live with Mother and Father until she was about four years old in Honduras. Then she lived separately with Father from that point forward, partially in Honduras[,] and also in the United States. As to any contact with Mother, once she lived separately with Father, [D.M.] reported that she would have occasional phone calls with Mother while in the [United States], but this is only when Father would call Mother from his personal phone to have [D.M.] talk to her. [¶] [D.M.] does recognize Mother as her biological mother, but there is not a significant mother-daughter relationship there. [D.M.'s] desire is not to return to Honduras but to remain in the [United States]."

Minor's counsel further argued that "all of [D.M.'s] ties"—i.e., her half siblings, school, and friends—were in the United States. Finally, minor's counsel argued that, because D.M. was "currently in immigration removal proceedings," placement in Honduras "would effectively deport [her]." He clarified, however, that his

8

"detriment argument . . . [was] not based solely on immigration implications," but rather on D.M.'s "ties to the United States."

DCFS agreed that D.M. should remain in her foster care placement in the United States, noting Mother was "noncustodial" and "whereabouts unknown" for "a large part of th[e] case."

In response, Mother's counsel reiterated Mother's request that the court place D.M. with her in Honduras. He urged the court to disregard minor's counsel's representations concerning D.M.'s placement preferences, arguing in pertinent part: "[U]nfortunately, [D.M.] is not here to be cross-examined. These statements that are being made are being portrayed by counsel without [our] being able to ask our version of questions to this minor. So I would ask that the court either one, disregard that testimony; or secondly, give it due weight at this point but not admit it as evidence in making its decision." Mother's counsel further argued that Father had prevented Mother from having more contact with D.M., and that Mother had made herself available to DCFS and the court as soon as DCFS contacted her. Finally, Mother's counsel argued that D.M.'s immigration proceedings were not relevant to the detriment inquiry.

The court denied Mother's request that it place D.M. in her custody, explaining:

"The court is mindful that the minor has a legal action pending in the immigration court. There's certain elements of that litigation that she is heavily vested in, along with Father, that she has extensive family ties here, including with Father. [¶] Those ties are meaningful to her in terms of her immigration matter as well as to continue that relationship. The relationship with Mother has been largely abbreviated, and the desires of this minor are not as in every other case where it's simply moving from one state to the next or returning to a home country. The minor has an active

action before the immigration court.  With that, I think to comply with it and not lose the right she's trying to assert in that regard, return would be detrimental not just to her case, but also to the relationships she's established here.  [¶] . . . [¶]  I do note that making that clear and convincing finding, I do accept the representations of [minor's counsel] as an officer of the court.  Those are consistent with the path that [D.M.] has chosen in terms of proceeding with her immigration case."

The court then entered dispositional orders removing D.M. from both parents, directing DCFS to refer D.M.'s case to the special immigrant juvenile (SIJ) status unit,[2] and requiring Mother to complete a case plan consisting of parenting classes.

---

[2] "Congress created the [SIJ] classification in 1990 to protect certain immigrant children and allow them to remain in the United States when it would not be in their best interests to be returned to their home countries.  [Citations.]  As amended, the law permits an immigrant ' "child" '—a term defined as 'an unmarried person under twenty-one years of age' [citation]—to apply for SIJ status if:  (1) the child is a dependent of a juvenile court, in the custody of a state agency by court order, or in the custody of an individual or entity appointed by the court; (2) it would not be viable to reunify the child with one or both parents because of 'abuse, neglect, abandonment, or a similar basis found under State law'; and (3) 'it would not be in the [child's] best interest to be returned to the [child's] or parent's previous country of nationality or country of last habitual residence.'  [Citation.]  Each of these predicate findings must be made in state court proceedings.  [Citation.]  A state court order containing these findings is a required component of an immigrant child's application to United States Citizenship and Immigration Services for special immigrant juvenile status, which allows the child to seek lawful permanent residence in the United States.  [Citation.]" (*Guardianship of Saul H.* (2022) 13 Cal.5th 827, 837–838 (*Saul H.*).)  "A court may . . . make a referral

Mother timely appealed.

## DISCUSSION

Mother contends we must reverse the orders because substantial evidence does not support the juvenile court's finding that placement with Mother in Honduras would be detrimental to D.M.'s physical or emotional well-being.  (See *In re C.M.* (2014) 232 Cal.App.4th 1394, 1402 (*C.M.*) [appellate court reviews detriment finding underlying dispositional order for substantial evidence].)  We agree.

" 'A parent's right to care, custody and management of a child is a fundamental liberty interest protected by the federal Constitution that will not be disturbed except in extreme cases where a parent acts in a manner incompatible with parenthood.' " (*In re Abram L.* (2013) 219 Cal.App.4th 452, 461 (*Abram L.*).)  Section 361.2, subdivision (a) governs the rights of a noncustodial parent to custody of a dependent child.[3]  The statute provides, in

---

to the local child welfare agency to assist in gathering evidence of eligibility for SIJ predicate findings.  [Citations.]" (*Id.* at p. 844.)

[3] The parties here agree that section 361.2—rather than section 361, subdivision (d), which concerns removal of a dependent child from a parent with whom the child does not reside—is the relevant statute.  We, however, note that "[t]here are questions regarding the interplay between [section] 361[, subdivision] (d) and [section] 361.2 (placement with noncustodial parent)." (1 Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2025) § 2.126.) "Under [section] 361[, subdivision] (d), the standard for removal is higher—requiring substantial danger and a no reasonable means of protection without a removal finding—as opposed to the [section] 361.2 standard that placement would be detrimental to the child's 'safety, protection, physical or emotional wellbeing.'  It may be that [section] 361.2 . . . applies to a noncustodial parent

pertinent part: "If a court orders removal of a child pursuant to [s]ection 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of [s]ection 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2., subd. (a).) Section 361.2, subdivision (a) thus "evinces the legislative preference for placement with the noncustodial parent when safe for the child." (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262 (*Patrick S.*).)

The noncustodial parent does not have to prove lack of detriment. (*C.M.*, *supra*, 232 Cal.App.4th at p. 1401.) Rather, the party opposing the placement bears the burden of demonstrating by clear and convincing evidence that the child would suffer detriment if placed with the noncustodial parent. (*Ibid.*) Clear and convincing evidence requires "a high probability, such that the evidence is so clear as to leave no substantial doubt." (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1262.) Thus, the question before us is " ' "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." [Citation.]' " (*In re A.T.* (2025) 110 Cal.App.5th 722, 736.)

_____

who 'requests custody' when a child is removed from a custodial parent and [section] 361[, subdivision] (d) applies when the noncustodial parent does not request custody." (1 Seiser & Kumli, *supra*, § 2.126.) In any case, we need not resolve these questions, because we conclude that DCFS failed to meet its burden here even under section 361.2's less demanding "detriment" standard.

12

Neither DCFS nor minor's counsel relies on D.M.'s immigration proceedings to support the detriment finding here. Rather, they argue the following factors support the finding: D.M. did not wish to live with Mother in Honduras; D.M. had not lived with Mother since she was a toddler and the two "did not have a 'significant mother-daughter relationship' "; Father, stepmother, and D.M.'s "half-siblings, friends, and school were all in [the United States]"; and finally, D.M. was receiving therapy and psychotropic medications in the United States, and there was no evidence she could obtain such services and medications in Honduras.

But the transcript of the disposition hearing makes clear that the juvenile court relied primarily on D.M.'s pending immigration proceedings in assessing detriment. And DCFS's argument concerning the absence of evidence in the record that D.M. could obtain necessary services in Honduras seeks improperly to shift the burden to Mother to prove lack of detriment. (See *C.M.*, *supra*, 232 Cal.App.4th at p. 1402 ["The nonoffending parent does not have to prove lack of detriment. Rather, the party opposing placement with a nonoffending parent has the burden"].) We therefore conclude that substantial evidence does not support the detriment finding in this case.

Minor's appellate counsel's discussion of the law governing SIJ status does not alter our conclusion. In her separate respondent's brief, she includes a summary of the analysis in *Saul H.*, where our high court held that a probate court erred by denying a petition for SIJ predicate findings from an 18-year-old petitioner who had fled gang threats in El Salvador. (*Saul H.*, *supra*, 13 Cal.5th at pp. 836, 840.) In addition, she asks us to take judicial notice of SIJ status findings the juvenile court made concerning D.M. on December 30, 2025 (i.e., six months after the disposition hearing at issue here). Minor's counsel, however, fails

13

to explain why these materials are relevant to the detriment finding Mother challenges on appeal.[4]  (Cf. *Saul H.*, *supra*, 13 Cal.5th at p. 853 ["issuance of SIJ predicate findings to a child does not in any way restrict the rights of the child's parent"].)

Finally, we decline to direct the juvenile court to consider on remand the factors enumerated in *In re Karla C.* (2010) 186 Cal.App.4th 1236, as DCFS and minor's counsel request. "On remand, the court may consider new evidence or changed circumstances that may have occurred during the pendency of this appeal." (*C.M.*, *supra*, 232 Cal.App.4th at p. 1405.)  As such, we leave it to the juvenile court to determine whether the factors identified in *Karla C.* are pertinent to its analysis.

Accordingly, we conclude that substantial evidence does not support the detriment finding here.  We therefore reverse the finding and the dispositional orders premised on the finding, and we remand to the juvenile court with directions to hold a new dispositional hearing on the issue of placement with Mother under section 361.2, subdivision (a).

---

[4] We therefore deny Mother's request that we take judicial notice of the SIJ status findings.

14

## DISPOSITION

The dispositional orders Mother challenges are reversed. On remand, the court shall conduct a new dispositional hearing on the issue of placement with Mother under section 361.2, subdivision (a).

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

WEINGART, J.

M. KIM, J.

15